1    CURRY ADVISORS
     A Professional Law Corporation
2        K. Todd Curry (149360)
     525 B Street, Ste. 1500
3    San Diego, California 92101
     Telephone:  (619) 238-0004
4    Fax Number: (619) 238-0006

5    Counsel for George Panagiotou

6

7

8                    UNITED STATES BANKRUPTCY COURT

9                    SOUTHERN DISTRICT OF CALIFORNIA

10

11   In re                              )    CASE NO.  16-07541-LT13
                                        )
12   RODRIGO MARQUEZ,                    )    Chapter 13
                                        )
13          Debtor.                      )    GEORGE PANAGIOTOU'S OPPOSITION
                                        )    TO MOTION FOR SANCTIONS AND
14                                       )    OTHER RELIEF
                                        )
15                                       )
                                        )    Date:   May 11, 2017
16                                       )    Time:   10:00 a.m.
                                        )    Dept:   Three
17                                       )    Honorable Laura S. Taylor
     _____ )
18

19

20

21

22

23

24   / / /

25   / / /

26   / / /

27   / / /

28   / / /

# TABLE OF CONTENTS

Page

I.    INTRODUCTION .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1

II    THE MOTION IS BASED ON INCORRECT FACTS.. . . . . . . . . . . . . . . . . . . .    4

III    THE BANKRUPTCY CODE AND RULES DO NOT IMPOSE
A DUTY ON ATTORNEYS TO VERIFY A DEBTOR'S IDENTITY. . . . . . .    7

IV.    THE COURT'S RIGHTS AND RESPONSIBILITIES FORMS DO NOT
IMPOSE AN OBLIGATION TO CHECK IDENTIFICATION DOCUMENTS.    9

V.    THE U.S. TRUSTEE'S WEBSITE IS SILENT REGARDING ANY
OBLIGATION OF DEBTOR'S COUNSEL TO VERIFY THE DEBTOR'S
IDENTITY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    9

VI.    THE TRUSTEES ARE THE GATEKEEPERS. . . . . . . . . . . . . . . . . . . . . . . . .    10

VII.    ANY BLANKET RULE REQUIRING ATTORNEYS TO VERIFY
IDENTITY SHOULD COME FROM CONGRESS OR THE COURTS.. . . . .    12

VIII.    THE FACTS SURROUNDING THIS CASE REMAIN SUSPICIOUS . . . . . .    13

IX .    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    15

- i -

1

**TABLE OF AUTHORITIES**

2

**Cases**                                                                                          **Page**

3       *In re Brown*, 328 B.R. 556 (Bankr. N.D. Cal. 2005) . . . . . . . . . . . . . . . . . . . . . . .        6

4       *Dressler v. The Seeley Co. (In re Silberkraus)*, 336 F.3d 864 (9th Cir. 2003) . . . . .        6

5       *Miller v. Cardinale (In re DeVille)*, 361 F.3d 539 (9th Cir. 2004) . . . . . . . . . . . . . .        5

6       *Orton v. Hoffman (In re Kayne)*, 453 B.R. 372 (9th Cir. BAP 2011) . . . . . . . . . . . .      5, 11

7       *In re Sandford*, 403 B.R. 831 (Bankr. D. Nev. 2009) . . . . . . . . . . . . . . . . . . . . . . . .        5

8       *Shalaby v. Mansdorfy (In re Nakhuda)*, 544 B.R. 886 (9th Cir. 2016) . . . . . . . . . . .        5

9       *In re Stomberg*, 487 B.R. 775 (Bankr. S.D. Tex. 2013) . . . . . . . . . . . . . . . . . . . . . .        6

10      *Valley National Bank v. Needler (In re Grantham Bros.)*,
            922 F.2d 1438 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .        5

11

12

13

14      **Other Authorities**                                                                              **Page**

15      11 U.S.C. §101(12A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .        8

16      11 U.S.C. § 521 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .        7-8

17      11 U.S.C. § 526 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .        8

18      11 U.S.C. § 527 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .        8

19      11 U.S.C. § 528 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .        8

20      F.R. Bankr. P. 4002(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .        8

21      F.R. Bankr. P. 9011 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     4, 8, 16

22      M. Tighe & E. Rosenblum, *"What Do You Mean I Filed Bankruptcy?"–*
        *Or How the Law Allows a Perfect Stranger to Purchase an Automatic Stay*
23      *in Your Name*, 32 Loyola of Los Angeles Law Review 1009 (1999) . . . . . .      11

24

25

26

27

28

1    George Panagiotou files this opposition to the Motion by the Acting United States

2    Trustee ("AUST") for sanctions and other relief against him.

3                                            **I.**

4                                    **INTRODUCTION**

5    Dennise Gurfinkiel[1] came to Mr. Panagiotou's office in the late afternoon of December

6    13, 2016, at approximately 4:00 p.m.  She claimed to have a business relationship with Rodrigo

7    Marquez, the Debtor in this matter, as to a condominium they jointly owned located at 6780

8    Friars Road  #183, San Diego, CA 92108 (the "Property").  Mr. Panagiotou understood from

9    what Ms. Gurfinkiel told him that Mr. Marquez lived there and that title was in their names.  She

10   indicated there was a Trustee's Sale of the Property set for 10:00 a.m. the next day, December 14,

11   2016, and that she and Mr. Marquez wanted help to file a Chapter 13 case to stop that sale.  Ms.

12   Gurfinkiel also said Mr. Marquez was at work and could not leave, which is why he had not

13   accompanied her to meet with Mr. Panagiotou.  She told Mr. Panagiotou that Mr. Marquez

14   owned and operated a car business named Caliente Auto Sales.  Mr. Panagiotou explained to Ms.

15   Gurfinkiel that he needed to speak with Mr. Marquez, that he had to sign the Voluntary Petition,

16   but that they could use his electronic signature if he signed a Declaration re Electronic Filing in

17   advance.  *See* the accompanying Declaration of George Panagiotou dated April 20, 2017

18   ("Panagiotou Declaration"), ¶ 2.

19   Ms. Gurfinkiel then called Mr. Marquez using her cell phone.  Mr. Panagiotou spoke with

20   Mr. Marquez, who confirmed his identity.  Mr. Panagiotou explained to Mr. Marquez that Ms.

21   Gurfinkiel informed him that he (Mr. Marquez) desired to file a Chapter 13 case to stop the

22   Trustee's Sale scheduled for the following day, and Mr. Panagiotou asked him to confirm

23   whether that was true.  He said yes, he wanted Mr. Panagiotou to proceed with filing a Chapter

24   13 case for him.  Mr. Panagiotou asked Mr. Marquez to send an e-mail confirming his

25   

26   [1]  In his March 9, 2017 declaration filed by the AUST, the Debtor, Rodrigo Marquez,
describes Ms. Gurfinkiel essentially as a business partner, as they were investing and/or acquiring
27   property and she was sharing purported sales proceeds with Mr. Marquez.  *See* the Marquez
Declaration, ¶¶ 3-8, 14.

28

1    authorization.  He said he would later that day.  Mr. Panagiotou told him he needed to sign a

2    Declaration re Electronic Filing in order to file the Petition using his electronic signature, and

3    Mr. Marquez said he would do so.  Mr. Panagiotou also told Mr. Marquez he had to complete the

4    required financial counseling class prior to the filing.  He replied he would do so on line that

5    night and send Mr. Panagiotou the Certificate.  Mr. Panagiotou further told him he needed to sign

6    a copy of the Petition as soon as possible.  Mr. Marquez stated that he was unable to leave work

7    to come to Mr. Panagiotou's office, but he agreed to come to the office the next day, December

8    14, 2016, at 10:00 a.m.  He asked that Mr. Panagiotou provide the documents to Ms. Gurfinkiel,

9    who would bring them to him for signature and return them to Mr. Panagiotou.  Mr. Marquez

10   provided Mr. Panagiotou his Social Security Number for purposes of preparing and filing the

11   Voluntary Chapter 13 Petition.  Panagiotou Declaration, ¶ 3.

12        After they concluded the telephone call, Mr. Panagiotou prepared a Declaration re

13   Electronic Filing, Petition, and Statement of Social Security Number and gave them to Ms.

14   Gurfinkiel to bring to Mr. Marquez for signature.  Ms. Gurfinkiel then left.  Ms. Gurfinkiel

15   returned later on December 13, 2016, with the original, signed Declaration re Electronic Filing.

16   Mr. Panagiotou has possession of the signed original document.  Panagiotou Declaration, ¶ 4 &

17   Exhibit A.

18        As promised, Mr. Panagiotou received an e-mail from Mr. Marquez shortly before 10:00

19   p.m. on December 13, 2016, authorizing him to proceed with filing the Chapter 13 case as

20   requested.  The e-mail address from which it was sent was calienteautosales@gmail.com, which

21   was consistent with Ms. Gurfinkiel's statement that Mr. Marquez's business is named Caliente

22   Auto Sales.[2]  Panagiotou Declaration, ¶ 5 & Exhibit B.

23        The next Day, December 14, 2016, Mr. Panagiotou prepared and, in light of the exigent

24   circumstances of the pending foreclosure that morning, filed a Voluntary Petition under Chapter

25   13 for Mr. Marquez [Docket No. 1] based on his oral and written authorizations, and using

26   _____

27        [2] Mr. Marquez admits in his March 9, 2017 Declaration that his business is named
     Caliente Auto Sales.  Marquez Declaration, ¶ 2.
28

1    information he and Ms. Gurfinkiel provided.  Mr. Panagiotou also filed a Statement of Social

2    Security Number using the information Mr. Marquez provided.  [Docket No. 2.]  Ms. Gurfinkiel

3    sent Mr. Panagiotou an e-mail at 8:33 a.m. that morning requesting a copy of the bankruptcy

4    filing for Mr. Marquez.  It shows that a copy was sent to calienteautosales@gmail.com.  *See* the

5    Panagiotou Declaration, ¶ 6 & Exhibit C.

6        Neither Mr. Marquez nor Ms. Gurfinkiel came to Mr. Panagiotou's office on December

7    14, 2016, as promised.  When neither of them appeared, Mr. Panagiotou called Ms. Gurfinkiel to

8    ask why no one showed up.  His call went directly to voice mail.  He left a message asking her to

9    call him right away.  When he did not hear back from Ms. Gurfinkiel, he called again later the

10    same day.  His call again went directly to voice mail.  He left another message asking that she

11    call him as soon as possible.  He did not hear from either Ms. Gurfinkiel or Mr. Marquez

12    thereafter.  Since neither Mr. Marquez nor Ms. Gurfinkiel communicated with him, he concluded

13    that this was an instance in which they wanted an emergency bankruptcy filing just to stop the

14    pending foreclosure but did not intend to pursue the Chapter 13 case.  Mr. Panagiotou has

15    experienced similar situations on occasion in the past.  Panagiotou Declaration, ¶ 7.

16        Mr. Panagiotou did not receive any money from Mr. Marquez, Ms. Gurfinkiel, or anyone

17    else in connection with this case, the services he provided, or the filing fee that he advanced.  In

18    light of the exigent circumstances, the telephone call he had with Mr. Marquez, the e-mail he

19    received from Mr. Marquez that appeared to come from Caliente Auto Sales (a business that Ms.

20    Gurfinkiel and Mr. Marquez indicated he owned and that Mr. Marquez also admits in his March

21    9, 2017 Declaration that he owns), the social security number that Mr. Marquez provided to Mr.

22    Panagiotou, the original Declaration re Electronic Filing that Mr. Panagiotou received, and the

23    representations of Ms. Gurfinkiel regarding her business relationship with Mr. Marquez, Mr.

24    Panagiotou believed he had appropriate authorization from Mr. Marquez to file an emergency

25    Chapter 13 case.  Panagiotou Declaration, ¶¶ 8-9.

26        Having now read the Declaration of Mr. Marquez submitted in support of the Motion,

27    Mr. Panagiotou realizes he has been the victim of outright fraud and not just unscrupulous clients

28    whose goal was to obtain free legal help under false pretenses.  There is clearly a dispute between

Mr. Marquez and Ms. Gurfinkiel which has now spilled over to affect Mr. Panagiotou.  Whatever

that dispute is, and regardless of which of them, or both, acted wrongfully, Mr. Panagiotou's

involvement was solely to help them to save the Property under exigent circumstances.  He did

not receive any money in connection with the case or the services he performed.  In fact, he

advanced the filing fee and has not been reimbursed for that expense.  Instead, he must spend

money and time to defend himself against false and fraudulent allegations which pose a threat to

his livelihood and reputation.  Mr. Panagiotou was not contacted by the Office of the United

States Trustee regarding the allegations prior to the filing of the Motion.  Had he been contacted,

he would have provided the above information as to what actually occurred in this case.

Panagiotou Declaration, ¶ 10.

## II.

### THE MOTION IS BASED ON INCORRECT FACTS.

The AUST relies on Rule 9011 as the legal basis for the relief requested.  Rule 9011

provides, in pertinent part, as follows:

**(b) Representations to the court**

By presenting to the court (whether by signing, filing, submitting, or later
advocating) a petition, pleading, written motion, or other paper, an attorney or
unrepresented party is certifying that to the best of the person's knowledge,
information, and belief, formed ***after an inquiry reasonable under the
circumstances***--

(1) it is not being presented for any improper purpose, such as to
harass or to cause unnecessary delay or needless increase in the
cost of litigation;

(2) the claims, defenses, and other legal contentions therein are
warranted by existing law or by a nonfrivolous argument for the
extension, modification, or reversal of existing law or the
establishment of new law;

(3) the allegations and other factual contentions have evidentiary
support or, if specifically so identified, are likely to have
evidentiary support after a reasonable opportunity for further
investigation or discovery; and

(4) the denials of factual contentions are warranted on the
evidence or, if specifically so identified, are reasonably based on a
lack of information or belief.

F. R. Bankr. P. 9011(b) (emphasis added).  In light of the facts set forth in Part I above and in

1    Mr. Panagiotou's Declaration, the Motion is based on incorrect facts.  Mr. Panagiotou did speak

2    with someone he reasonably believed to be Mr. Marquez who authorized the bankruptcy filing,

3    he received an e-mail that he reasonably believed to be from Mr. Marquez at his business,

4    Caliente Auto Sales, who authorized the bankruptcy filing, and he did obtain an original

5    Declaration re Electronic Filing.  Based on the March 9, 2017 Declaration from Mr. Marquez

6    that was filed by the AUST, perhaps both Mr. Marquez and Mr. Panagiotou have been the

7    victims of bankruptcy fraud.  However, under the exigent circumstances as they existed at the

8    time of the bankruptcy filing, Mr. Panagiotou acted reasonably.  Therefore, the Motion should be

9    denied in its entirety.

10          The instant case is not at all similar to the cases cited by the AUST for the proposition

11   that Rule 9011 has been violated.  *See* the Motion at 8-14.  *Miller v. Cardinale (In re DeVille)*,

12   361 F.3d 539 (9th Cir. 2004) involved counsel that used serial bankruptcy filings and removals

13   from state court to delay proceedings.  That did not happen here.

14          In *Shalaby v. Mansdorfy (In re Nakhuda)*, 544 B.R. 886 (9th Cir. 2016), counsel did not

15   have signatures on electronically filed documents.  Here, Mr. Panagiotou has an original, signed

16   Declaration re Electronic Filing.

17          In *Orton v. Hoffman (In re Kayne)*, 453 B.R. 372 (9th Cir. BAP 2011), the lawyer filed

18   schedules and a statement of financial affairs that he knew were inaccurate.  Mr. Panagiotou did

19   not know or even have reason to know that anything was amiss in connection with the emergency

20   bankruptcy filing.

21          In *Valley National Bank v. Needler (In re Grantham Bros.)*, 922 F.2d 1438 (9th Cir.

22   1991), the lawyer filed a complaint containing a cause of action that was a frivolous collateral

23   attack on a final order.  Here, in light of Mr. Marquez's version of the facts, Mr. Panagiotou

24   apparently was tricked into filing the bankruptcy petition.

25          In *In re Sandford*, 403 B.R. 831 (Bankr. D. Nev. 2009), the attorney filed an unnecessary,

26   second bankruptcy case.  Here, there was one bankruptcy case for Mr. Marquez, and it appeared

27   necessary to save the Property from imminent foreclosure.  The filing apparently stopped the

28   / / /

1   foreclosure, at least until after the bankruptcy case was dismissed.  Mr. Marquez does not deny

2   this.

3          In *Dressler v. The Seeley Co. (In re Silberkraus)*, 336 F.3d 864 (9th Cir. 2003), the

4   attorney filed a Chapter 11 case that was not warranted by the facts and for an improper purpose

5   of delaying litigation.  In contrast, Mr. Panagiotou filed Mr. Marquez's case for the legitimate

6   purpose of saving the Property from foreclosure.  Indeed, the foreclosure sale was stopped until

7   after the bankruptcy case was dismissed.

8          *In re Brown*, 328 B.R. 556 (Bankr. N.D. Cal. 2005) involved an attorney who was

9   sanctioned $250 for failing to possess signed documents that were filed electronically.  Here, Mr.

10  Panagiotou has an original, signed Declaration re Electronic Filing.

11         In *In re Stomberg*, 487 B.R. 775 (Bankr. S.D. Tex. 2013), the attorney never obtained the

12  debtor's signature on the bankruptcy schedules and statement of financial affairs, which meant

13  that there was no verification by the client that the information was accurate.  Here, Mr.

14  Panagiotou obtained an original signature from a person who under the circumstances appeared

15  to be Mr. Marquez.  Any suggestion by the AUST that an in-person meeting with any alleged

16  imposter would have prevented the filing would be purely speculative.  An in-person meeting is

17  not required in every case, and in any event, people commit fraud every day in person.  A

18  determined criminal is not so easily deterred.

19         None of the cases cited by the AUST involved a scheme[3] to trick the lawyer into thinking

20  he was speaking with and receiving e-mails from the actual debtor whose bankruptcy petition

21  was to be filed.  None of those cases involved an allegedly forged, original signature on the key

22  document needed to file a petition electronically (which signature, as noted in Part VIII below,

23  looks remarkably similar to Mr. Marquez's actual signature).  And none of those cases involved a

24  purported debtor's telephonic and written authorizations to file a petition and who later claimed

25  not to be the person who gave those authorizations.  Mr. Panagiotou has located no case that

26  makes a lawyer a guarantor against identity theft by a determined criminal.

27

28         [3]  *See* the discussion in Parts VII and VIII below regarding the planning that would have
    been necessary to accomplish a fraudulent filing in the instant case.

1    Although the bankruptcy system has some protections designed to deter identity theft, the

2    system is not fool proof, nor is it designed to be.  As discussed in more detail below, the required

3    procedures strike a balance between protecting people from identity theft and enabling

4    reasonable access to the bankruptcy system, even under emergency circumstances.

5    With regard to the amount and type of sanctions and other relief requested, Mr.

6    Panagiotou should not be sanctioned in any manner or required or ordered to do anything.  If Mr.

7    Marquez's declaration is accurate, then Mr. Panagiotou was a victim of fraud as well, and he has

8    incurred thousands of dollars of attorneys' fees, lost time, and the filing fee (which has not been

9    reimbursed).  Mr. Panagiotou has suffered more than enough.[4]  In any event, the proposed

10    sanctions, including potential career-ending disciplinary measures, are grossly out of proportion

11    in light of all the facts and circumstances presented to Mr. Panagiotou immediately before the

12    filing and the various unanswered questions mentioned in Part VIII below.

13    Finally, with respect to the AUST's request for a finding that the bankruptcy case was

14    filed without Mr. Marquez's consent, such a finding is premature.  Mr. Marquez appears to have

15    received a benefit from the bankruptcy filing through a delayed foreclosure, which is an unusual

16    feature of an identity theft bankruptcy filing.  In addition, as discussed in Part VIII below, the

17    circumstances of the case remain suspicious, and many questions remain. The Court should defer

18    for now any finding that the case was filed without Mr. Marquez's consent.

19    **III.**

20    **THE BANKRUPTCY CODE AND RULES DO NOT IMPOSE**

21    **A DUTY ON ATTORNEYS TO VERIFY A DEBTOR'S IDENTITY.**

22    The Bankruptcy Code sets forth generally in section 521 what a debtor must do to file for

23    bankruptcy.  One thing a debtor need not do in order to file a petition is prove who he or she is.

24    *See generally* 11 U.S.C. § 521.  The Bankruptcy Code contains no requirements concerning

25    verification of a debtor's identity before filing a petition.  Section 521(h) does require that "if

26    requested by ***the United States trustee*** or by ***the trustee***," the debtor must provide documents

27    _____

28    [4]  Also, the AUST has not submitted any authority for the proposition that a U.S. Trustee may be paid for the assumed value of the time of her employees.

1   verifying his or her identity.  11 U.S.C. § 521(h) (emphasis added).  Congress easily could have

2   required in section 521 (or elsewhere) that debtor's counsel must obtain and review such

3   documents before filing the petition, but Congress did not do so.

4          Similarly, Federal Rule of Bankruptcy Procedure 4002(b)(1) requires that a debtor

5   provide identification documentation consisting of government issued picture identification or

6   other personal identifying information that establishes the debtor's identity, plus evidence of

7   social security number.  However, the debtor only must bring such documentation "to the

8   meeting of creditors under § 341."  F.R. Bankr. P. 4002(b).  Nothing in the Rule requires the

9   debtor to provide, or debtor's counsel to review or collect, identification information sooner than

10  the meeting of creditors.

11         Bankruptcy Code sections 526, 527, and 528 contain numerous duties and restrictions

12  imposed on debt relief agencies (which include lawyers filing consumer cases).  11 U.S.C. §§

13  526, 527, 528, 101(12A).  The duty to obtain identity documentation before filing the petition is

14  not one of the requirements.  Congress easily could have required that debtor's counsel must

15  obtain and review such documentation before the petition is filed, but Congress did not do so.

16         It is clear from the Code and the Rules that the meeting of creditors is the time and place

17  for verifying a debtor's identity–not before then.  It must be presumed that Congress (as to the

18  Code) and the Supreme Court (as to the Rules) are aware of and have assessed the risks

19  associated with delaying identity verification until the meeting of creditors, and they have

20  determined that the risks are adequately addressed by the above-stated provisions and other

21  applicable laws concerning identity theft and bankruptcy fraud.  It is highly unlikely that

22  Congress and the Supreme Court expressly would address the issue of establishing a debtor's

23  identity in the above-mentioned provisions, and expressly would impose a whole host of other

24  obligations and restrictions on bankruptcy counsel, while leaving merely implicit, within Rule

25  9011, a purported mandatory obligation of debtor's counsel to check identity documentation

26  before filing any bankruptcy petition.

27  / / /

28  / / /

**IV.**

**THE COURT'S RIGHTS AND RESPONSIBILITIES FORMS DO NOT**

**IMPOSE AN OBLIGATION TO CHECK IDENTIFICATION DOCUMENTS**.

The Bankruptcy Court for the Southern District of California began a few years ago requiring the filing of the Rights and Responsibilities documents in Chapter 7 and Chapter 13 cases. *See* attached Exhibits 1, 2, and 3. Although these forms do not purport to spell out every possible obligation of a lawyer to his or her client, one might expect that an obligation as specific as checking a debtor's identification before filing any bankruptcy petition would be spelled out.

The forms do mention that the attorney must, among other things, "meet with the debtor to review the debtor's assets, liabilities, income and expenses." However, the forms do not indicate *when*, particularly in the context of barebones filing, that meeting must take place, although presumably it must take place before the schedules, statement of financial affairs, and other documents stating the debtor's "assets, liabilities, income and expenses" are filed. The forms also do not indicate that the "meeting" must be in person, nor do they prohibit telephonic meetings even under exigent circumstances and in the context of a barebones filing. Further, the Chapter 13 forms only require the "meeting" as a condition of payment–they do not indicate that any failure to "meet" makes the filing itself improper. And importantly, the forms do not mention any duty to check identification documents, including before filing a barebones petition.

**V.**

**THE U.S. TRUSTEE'S WEBSITE IS SILENT REGARDING ANY OBLIGATION**

**OF DEBTOR'S COUNSEL TO VERIFY THE DEBTOR'S IDENTITY.**

The website for the UST Region 15 can be found at https://www.justice.gov/ust-regions-r15/region-15-southern-district-california. Under "General Information," the website contains, among other information, Guidelines for debtors' counsel regarding employment applications and fee applications. There is no mention that debtor's counsel must collect identity verification information before filing a petition.

Under the "Chapter 7" heading, the website contains a Notice Regarding Verification of Social Security Numbers, which indicates that, pursuant to Bankruptcy Code section 521(h),

debtors must provide "***the trustee assigned to their case***" appropriate proof of their social

security number.  *See* Exhibit 4 (emphasis added).  There is no mention of any requirement to

provide this identity verification information to debtor's counsel, nor is there any mention of an

obligation by debtor's counsel to collect it before filing a petition (or at any other time).

Under the "Chapter 13" heading, the website contains the "Chapter 13 Administration

Guidelines Southern District of California."  *See* the excerpts attached at Exhibit 5.  In those

Guidelines:

●    A section entitled "Identification" requires that an individual debtor must present

identity verification documentation "[a]t the 341(a) Meeting."  It does not indicate that the debtor

must present such documentation at any other time, nor does it indicate that debtor's counsel

must review or collect such documentation at any time.

●    A section entitled "Attorney Responsibilities" sets forth some duties of debtor's

counsel.  Verification of the debtor's identity is not among the duties listed.  Under a section

addressing supporting documentation that must be sent to the Trustee, a whole host of documents

are listed, none of which are identity verification documents.

●    A section entitled "Policy on Barebones Filings" informs debtors and their

counsel that a debtor who does not wish to notice a plan to creditors is not acting in good faith.  It

would be a simple matter to include a provision, perhaps particularly applicable in barebones

cases (which often are filed under exigent circumstances), that cases filed by attorneys without

the debtor having first provided governmental identification are filed in violation of the

Bankruptcy Code and/or the Bankruptcy Rules, or are not filed in good faith and/or with

reasonable investigation.  There is no such provision.

## VI.

## THE TRUSTEES ARE THE GATEKEEPERS.

It appears that the AUST contends in the Motion that debtors' counsel are the

gatekeepers, should conduct identity checks in every instance before filing bankruptcy petitions,

and in effect must guarantee that debtors are who they claim to be or face sanctions and career-

destroying discipline.  However, as discussed above, the Code, the Rules, and even the AUST's

1  own website all are in accord that ***the bankruptcy trustees*** are the gatekeepers when it comes to

2  verification of a debtor's identity.  Could Congress or the courts implement a rule that would

3  require lawyers to verify the identities of their clients, or that would require the Clerks of the

4  Bankruptcy Courts to check identification, before filing bankruptcy petitions?  Certainly they

5  could, and at least then, lawyers fairly would be on notice that their duties include identity

6  verification in every case.  In light of the discussion above, Mr. Panagiotou never was on notice

7  that his duties include verification of debtors' identities, even under exigent circumstances when

8  no red flags appear to exist.

9        Query whether new restrictions on bankruptcy filings are desirable or even necessary, and

10  query whether the use of lawyers to file fraudulent bankruptcy petitions is so widespread as to

11  need regulation.[5]  What is clear is that the trustees are the ones who presently are charged with

12  making sure debtors are who they claim to be, and lawyers are not presently on notice that they

13  must verify debtors' identities before filing a petition.

14        It bears noting also that although perhaps a few local bankruptcy practitioners collect

15  identification documents from their clients (when practicable) before filing bankruptcy petitions,

16  it cannot be said that the practice is widespread or even sufficiently common that it has become a

17  "community standard" under which competent attorneys practicing before this Court engage in

18  such practice.  *See Orton*, 453 B.R. at 382 (under Rule 9011, the trial court must measure the

19  attorney's conduct "objectively against a reasonableness standard, which consists of a competent

20  attorney admitted to practice before the involved court").  The AUST does not contend

21  otherwise.  No doubt a case could arise where, in a non-emergency context where property is not

22  about to be sold at foreclosure sale, and in the face of other evidence that clearly suggests (or

23  reasonably should suggest) to the lawyer that he or she is dealing with an imposter, the lawyer

24

25        [5]  In a 1999 article authored in part by Maureen A. Tighe, the U.S. trustee for the Central

26  District of California, she indicates that almost every bankruptcy identity theft case ever reported
    has been filed pro se, without an attorney.  *See* M. Tighe & E. Rosenblum, *"What Do You Mean*

27  *I Filed Bankruptcy?"– Or How the Law Allows a Perfect Stranger to Purchase an Automatic*
    *Stay in Your Name*, 32 Loyola of Los Angeles Law Review 1009, 1024 (1999) (copy attached as

28  Exhibit 6).

1    would have a duty to take further steps or to make further inquires before filing.  This is not that

2    case, nor is this case the case described in the Motion.

3                                        **VII.**

4               **ANY BLANKET RULE REQUIRING ATTORNEYS TO VERIFY**

5               **IDENTITY SHOULD COME FROM CONGRESS OR THE COURTS.**

6               The AUST's position would appear to single out attorneys who file bankruptcy cases.

7    After all, in a pro se filing, there is no third party to verify identity other than the Trustee, who

8    verifies identity in all individual cases, post-filing, without regard to whether the debtor is

9    represented by counsel.  Would a blanket rule requiring only attorney-filed cases to have third

10   party verification of identity significantly curb fraudulent bankruptcy filings by identity thieves?

11   Although Mr. Panagiotou has not located statistics, it seems doubtful.

12              Most fraudsters likely would find it easier to commit their crimes by filing without an

13   attorney, which perhaps explains why most bankruptcy identity theft cases are pro se cases.  *See*

14   *supra* note 5.  Some people clearly are so intent on filing fraudulent petitions that they would do

15   what Mr. Marquez's and Mr. Panagiotou's contentions suggest was done in this case, which was:

16   (1) to arrange for an imposter to stand by via telephone to accept the telephone call from Ms.

17   Gurfinkiel and Mr. Panagiotou so that he could falsely claim to be Mr. Marquez and present a

18   false story; (2) to anticipate in advance that Mr. Panagiotou would insist upon receiving an e-

19   mail authorization from Mr. Marquez, and in advance hack the e-mail of Caliente Auto Sales (or

20   create a spoofed e-mail that appeared to be from Caliente Auto Sales), and to send the bogus e-

21   mail to Mr. Panagiotou authorizing the filing; and (3) to anticipate in advance that Mr.

22   Panagiotou would insist upon an original signature on the Declaration re Electronic Filing, and

23   (as discussed below in Part VIII) to obtain in advance a document with Mr. Marquez's signature

24   on it and practice forging his signature so that it looks quite similar to Mr. Marquez's actual

25   signature.  If someone is that criminally clever, they hardly need an attorney, and they can figure

26   out how to file a pro se bankruptcy petition without facing any of the trouble Mr. Panagiotou put

27   them through before the filing.  In short, while preventing fraudulent bankruptcy filings

28   unquestionably is a worthwhile goal, creating barriers for attorneys to file cases (particularly on

1    an emergency basis) while doing nothing to address pro se filings seems not to be an effective

2    approach.

3         Mr. Panagiotou submits that if a policy is to be implemented that singles out attorney-

4    filed cases for disparate treatment (*i.e.,* pre-filing, third party verification of debtors' identities),

5    that invades the attorney-client relationship, and that hampers legitimate debtors' access to the

6    bankruptcy courts (particularly with respect to exigent filings), then Congress or the courts

7    (through local rules) should implement such a policy.  It seems highly unlikely that, as the AUST

8    seems to suggest, such an important a policy with important implications to both attorneys and

9    debtors alike already has been implemented and exists sub silentio within Rule 9011.

10                                          **VIII.**

11            **THE FACTS SURROUNDING THIS CASE REMAIN SUSPICIOUS.**

12        Mr. Panagiotou submits that the Motion can and should be denied in its entirety without

13   him having to incur the time and expense to determine which of the persons involved is the one

14   attempting to perpetrate a fraud on the court.[6]  Clearly, it is either Ms. Gurfinkiel and her

15   unidentified accomplice, or it is Mr. Marquez, who changed his mind regarding his bankruptcy

16   filing and wants it removed from his record.  At present, and for purposes of this opposition, it

17   may be assumed that Mr. Marquez is being truthful in his March 9, 2017 Declaration.  That being

18   said, the circumstances of this case are suspicious and are not cleared up by Mr. Marquez's

19   Declaration.  For example:

20        •     If the person on the telephone was not really Mr. Marquez, then Ms. Gurfinkiel

21   must have known in advance that Mr. Panagiotou would want to speak with Mr. Marquez, and

22   she must have arranged in advance for an imposter to be available to speak with Mr. Panagiotou

23   about the bankruptcy filing.  That is possible, but if that occurred, it would indicate a significant

24   level of sophistication on the part of Ms. Gurfinkiel and the accomplice.

25        •     Ms. Gurfinkiel would have needed to anticipate in advance and rehearse with the

26   imposter the scenario whereby Mr. Panagiotou would insist upon an original, signed Declaration

27   _____

28   [6] Once Mr. Panagiotou clears his name of the false allegations made against him, he
     intends to investigate on his own and expose the truth about what happened.

1  re Electronic Filing and the imposter would need to claim he was busy but that Ms. Gurfinkiel

2  could bring it and he would sign it and send it back with her.  Again, this would reveal

3  significant sophistication.

4       ●    Ms. Gurfinkiel would have needed to obtain in advance a sample of Mr.

5  Marquez's signature and practice forging Mr. Marquez's signature, because the original signature

6  on the Declaration re Electronic Filing that is in Mr. Panagiotou's possession looks remarkably

7  similar to Mr. Marquez's signature on his March 9, 2017 Declaration provided to the AUST.  *See*

8  the Panagiotou Declaration, Exhibit A.  It is possible that fraudsters would, in the rush to get the

9  bankruptcy filed quickly, take time accurately to forge Mr. Marquez's signature, but one must

10  question why that was done when (i) the goal apparently was to accomplish the bankruptcy filing

11  and obtain only a few weeks of delay (until the non-appearance at the creditor meeting), and (ii)

12  unlike identity verification, signature matching is not undertaken by anyone in the bankruptcy

13  system, not even by the Trustee.

14       ●    Despite Mr. Marquez having contacted the AUST to complain about the

15  bankruptcy filing and to provide the AUST with a declaration under penalty of perjury, Mr. Ortiz

16  indicates that Mr. Marquez left no telephone number with the AUST, making it difficult to

17  follow up with Mr. Marquez.

18       ●    The address provided to the UST by Mr. Marquez, as revealed in the proof of

19  service accompanying the Motion, is for Caliente Auto Sales at 482 W. San Ysidro Blvd., Ste.

20  1034, San Ysidro, CA 92173.  According to www.yelp.com, that address is for Correo

21  International, which would appear to be a mail drop, rather than an actual business or residence

22  address for Mr. Marquez.  More investigation is needed into this issue.

23       ●    The Motion states that "the Petition falsely lists Mr. Marquez's residential living

24  address as 6780 Friars Road #133, San Diego California 92108."  Motion at 3.  Mr. Marquez

25  does not deny that this is or was his residential living address.  In fact, he has not revealed his

26  residential address.

27       ●    The Motion implies that the Petition falsely states that Mr. Marquez obtained

28  credit counseling.  Motion at 3.  Mr. Marquez does not deny that he obtained credit counseling.

1    •    Mr. Panagiotou also filed a Chapter 13 case for Ms. Gurfinkiel at the same time.

2    *See* the Motion at 6 n.5.  ***Identity thieves do not do that.  They file under someone else's name,***

3    ***not their own names.***

4    •    Mr. Marquez appears to have personally benefitted from the bankruptcy filing

5    under his name, as the foreclosure sale was delayed.  Benefit to the alleged victim is not a typical

6    hallmark of an identity theft bankruptcy filing.

7    •    Finally, Ms. Gurfinkiel's cellular telephone records should show conclusively

8    whom she called that day to enable Mr. Panagiotou to discuss the bankruptcy filing, whether it

9    was an imposter or the real Mr. Marquez, so whichever person committed this fraud will be

10   exposed via subpoena if necessary.  Perhaps Mr. Marquez desires voluntarily to provide his own

11   telephone records to help in the investigation.  Efforts to bring the perpetrator to justice should

12   not, however, delay the Court's denial of the Motion.

13                                                    **IX.**

14                                              **CONCLUSION**

15   Mr. Panagiotou acted reasonably under the emergency circumstances presented to him,

16   including by doing the following:  Speaking by telephone with a person who purported to be Mr.

17   Marquez and who confirmed he wanted to file a Chapter 13 case; dealing with Ms. Gurfinkiel,

18   who Mr. Marquez admits is his business partner, who according to Mr. Marquez paid him

19   $35,703.29 on account of some transaction in which the two of them were involved, and who

20   presumably owed Mr. Marquez fiduciary duties as business partners do; obtaining Mr. Marquez's

21   assurance that he had obtained credit counseling; obtaining an e-mail authorization for the filing

22   from Mr. Marquez that came from an e-mail domain having the name Caliente Auto Sales

23   (which Mr. Marquez admits is the name of his business); obtaining from Mr. Marquez over the

24   telephone a social security number; and sending documents to Mr. Marquez in care of his

25   business partner (at Mr. Marquez's request) and obtaining an original signature of Mr. Marquez

26   on the Declaration re Electronic Filing.  The circumstances also include that Mr. Panagiotou filed

27   a Chapter 13 case for Ms. Gurfinkiel at the same time, which is the opposite of a red flag because

28   identity thieves do not do that–they file only in someone else's name to protect themselves.  The

1   circumstances further include that there is no blanket requirement that a bankruptcy attorney

2   obtain proof of a client's identity before filing a petition, a bankruptcy attorney does not

3   guarantee that a debtor is who he or she claims to be, and there is no generally accepted

4   community practice among lawyers in the community to obtain identification documents from

5   debtors before filing bankruptcy petitions.  Any such blanket requirement for attorneys to become

6   the gatekeepers for verification of debtors' identity should come from Congress or the courts, not

7   from an assumed, sub silientio requirement of Rule 9011.  For all of these reasons, the Motion

8   should be denied in its entirety.

9

10   Dated: April 20, 2017                              CURRY ADVISORS
                                                        A Professional Law Corporation

11

12                                          By:    /s/ K. Todd Curry
                                                   _____
13                                                 K. Todd Curry
                                                   Counsel for George Panagiotou
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-16-

# EXHIBIT 1

Revised: 03/01/15
Name, Address, Telephone No. & I.D. No.

**UNITED STATES BANKRUPTCY COURT**
SOUTHERN DISTRICT OF CALIFORNIA
325 West "F" Street, San Diego, California 92101-6991

In Re

BANKRUPTCY NO.

Last four digits of Soc. Sec. or              Debtor.
Individual-Taxpayer I.D.(ITIN)/Complete EIN:

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF CALIFORNIA
## RIGHTS AND RESPONSIBILITIES OF CHAPTER 13 DEBTORS
## AND THEIR ATTORNEY
### (Consumer Case)

It is important for debtors who file a bankruptcy case under Chapter 13 to understand their rights and responsibilities. It is also important that the debtors know what their attorney's responsibilities are, and understand the importance of communicating with their attorney to make the case successful. Debtors should also know that they may expect certain services to be performed by their attorney. It is also important for debtors to know the costs of attorneys' fees through the life of a plan. To assure that debtors and their attorney understand their rights and responsibilities in the bankruptcy process, the following rights and responsibilities provided by the United States Bankruptcy Court are hereby agreed to by the debtors and their attorney. (Nothing in this agreement should be construed to excuse an attorney from any ethical duties or responsibilities under Federal Rule of Bankruptcy Procedure 9011.)

## UNLESS THE COURT ORDERS OTHERWISE,

### *The debtor must:*

1.   Provide accurate financial information.
2.   Provide information in a timely manner.
3.   Cooperate and communicate with the attorney.
4.   Discuss with the attorney the debtor's objectives in filing the case.
5.   Keep the trustee and attorney informed of the debtor's address and telephone number.
6.   Inform the attorney of any wage garnishments or attachments of assets which occur or continue after the filing of the case.
7.   Contact the attorney promptly if the debtor loses his/her job or has other financial problems.
8.   Let the attorney know immediately if the debtor is sued before or during the case.
9.   Inform the attorney if any tax refunds the debtor is entitled to are seized or not returned to the debtor by the IRS or Franchise Tax Board.
10.  Contact the attorney before buying, refinancing, or selling real property or before entering into any long-term loan agreements to find out what approvals are required.

11.     Pay any filing fees and filing expenses that may be incurred directly to the attorney.
12.     Pay appropriate attorney's fees commensurate with this agreement and the United States
        Bankruptcy Court Guidelines regarding Chapter 13 Attorney Fees. If a court order is entered
        regarding attorney's fees, fees should be paid in accordance with the court's order.

### *To receive $3,600, which is within the United States Bankruptcy Court's parameters for "initial fees," the attorney must:*

1.      Meet with the debtor to review the debtor's assets, liabilities, income and expenses.
2.      Analyze the debtor's financial situation, and render advice to the debtor in determining
        whether to file a petition in bankruptcy.
3.      Counsel the debtor regarding the advisability of filing either a Chapter 7 or Chapter 13 case,
        discuss both procedures with the debtor, and answer the debtor's questions.
4.      Explain to the debtor how the attorney's fees and trustee's fees are paid.
5.      Explain what payments will be made directly by the debtor and what payments will be made
        through the debtor's chapter 13 plan, with particular attention to mortgage and vehicle loan
        payments, as well as any other claims with accrued interest.
6.      Explain to the debtor how, when, and where to make the chapter 13 plan payments.
7.      Explain to the debtor that the first plan payment must be made to the Trustee within 30 days
        of the date the plan is filed.
8.      Advise the debtor of the requirement to attend the § 341(a) Meeting of Creditors, and
        instruct the debtor as to the date, time and place of the meeting.
9.      Advise the debtor of the necessity of maintaining liability, collision and comprehensive
        insurance on vehicles securing loans or leases.
10.     Timely prepare, file and serve the debtor's petition, plan, schedules, statement of financial
        affairs, and any necessary amendments thereto, which may be required.
11.     Provide an executed copy of the Rights and Responsibilities of Chapter 13 Debtors and their
        Attorneys and a copy of the Court's Guidelines regarding Chapter 13 Attorney Fees to the
        debtor.
12.     Appear and represent the debtor at the § 341(a) Meeting of Creditors and any
        confirmation hearings.
13.     Respond to the objections to plan confirmation, and where necessary, prepare, file and serve
        an amended plan.
14.     Provide Certification of Eligibility for Discharge pursuant to Local Bankruptcy Rule 4004-1.
15.     Provide such other legal services as are necessary for the administration of the case before
        the Bankruptcy Court, which include, but are not limited to, a continuing obligation to assist
        the debtor by returning telephone calls, answering questions and reviewing and sending
        correspondence.

### *Additional services may be required, but are not included in the "initial fees" of $3,600. If necessary and when appropriate, the attorney, at the debtor's request and only with the debtor's cooperation, must provide the following services for "additional fees" described below:*

1.      Prepare, file and serve necessary modifications to the plan post-confirmation, which may
        include suspending, lowering or increasing plan payments.
2.      Prepare, file and serve necessary motions to buy, sell or refinance real property and authorize
        use of cash collateral or assume executory contracts or unexpired leases.
3.      Object to improper or invalid claims.
4.      Represent the debtor in motions for relief from stay.
5.      Prepare, file and serve necessary motions to avoid liens on real or personal property.

2

6.     Prepare, file and serve necessary oppositions to motions for dismissal of case.
7.     Provide such other legal services as are necessary for the administration of the case before the Bankruptcy Court, which include but are not limited to, presenting appropriate legal pleadings and making appropriate court appearances.

***Should additional services be provided and "additional fees" requested, the attorney must:***

1.     Provide proper notice in accordance with Federal Rule of Bankruptcy Procedure 2002.
2.     Advise the debtor of all "additional fees" requested and file a declaration with the court stating that counsel has so advised the debtor of the fees requested and the debtor has no objection to the requested fees.

The "Guidelines Regarding Chapter 13 Attorney Fees" provide for "additional fees" within the United States Bankruptcy Court's parameters for "additional fees" in the following amounts and include all court appearances required to pursue described actions:

<u>**Modified Plan (Post-Confirmation)**</u>          **$650**

for fees and expenses for services rendered post-confirmation for preparing, filing, noticing, and attending hearings in regard to a debtor's modified plan under section 1329 of the Bankruptcy Code (including the preparation of amended income and expenses statements and providing proof of income). (These fees should be less for modification due to clerical error or other administrative issues.)

<u>**Opposition to Motions for Relief from Stay**</u>

| | | |
|---|---|---|
| **$490** | **(Personal property)** | for fees and expenses of all services rendered in |
| **$625** | **(Real property)** | opposition to motions to modify or vacate automatic stay. |

<u>**Obtaining Orders re: Sale or Refinance of Real Property**</u>

| | | |
|---|---|---|
| **$545** | **(By stipulation or noticed hearing)** | for fees and expenses of all services rendered for order authorizing the sale or refinancing of real estate. |

<u>**Objections to Claim**</u>

| | | |
|---|---|---|
| **$270** | **(Uncontested objections without hearing)** | for fees and expenses of all services rendered for preparing, filing and noticing objections |
| **$380** | **(Contested objections with a hearing)** | to a claim. (Fees must not exceed 50% of the amount the trustee would have otherwise paid.) |

<u>**Oppositions to Dismissal/Motions to Avoid Lien/Other**</u>
<u>**Routine Pleadings**</u>          **$490**

for fees and expenses of all services rendered for preparing, filing, noticing, and attending hearings in opposition to a motion to dismiss the case, for motions to avoid lien and other routine pleadings.

3

**Motions to Value Real Property, Treat Claim as**
**Unsecured and Avoid Junior Lien (Lien Strips)**          **$625**

for fees and expenses of all services rendered for preparing, filing, noticing, and attending hearings when there is opposition to a motion to value real property, treat claim as unsecured and avoid junior lien.

**Motions to Impose/Extend Automatic Stay**

| | |
|---|---|
| **$380  (Unopposed)** | for fees and expenses of all services rendered for |
| **$545  (Opposed)** | preparing, filing, noticing and attending hearings in regard to a motion to impose/extend automatic stay. |

**Novel and Complex Motions and Oppositions to Motions**

These types of motions and oppositions may be billed at hourly rates and counsel must file a fee application in compliance with Federal Rules of Bankruptcy Procedure and Local Bankruptcy Rules 2002 and 2016.

Initial fee charged in this case is $___ ___ ___ ___

All post-filing fees will be paid through the plan, unless the court orders otherwise. The attorney may not receive fees directly from the debtor other than the initial retainer, unless the court orders otherwise. All "additional fees," as described above, may only be paid upon court authorization after compliance with the "Guidelines Regarding Chapter 13 Attorney Fees." The attorney may seek fees above the additional fees provided a fee application is noticed, filed and approved by the court.

If the debtor disputes the legal services provided or the fees charged by the attorney, the debtor may file an objection with the court and set the matter for hearing. The attorney may move to withdraw or the debtor may discharge the attorney at any time.

Dated:

_____
Debtor

Dated:

_____
Debtor

Dated:

_____
Attorney for Debtor(s)

4

# EXHIBIT 2

Revised: 03/01/15
Name, Address, Telephone No. & I.D. No.

**UNITED STATES BANKRUPTCY COURT**
SOUTHERN DISTRICT OF CALIFORNIA
325 West "F" Street, San Diego, California 92101-6991

In Re

BANKRUPTCY NO.

Last four digits of Soc. Sec. or          Debtor.
Individual-Taxpayer I.D.(ITIN)/Complete EIN:

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF CALIFORNIA
## RIGHTS AND RESPONSIBILITIES OF CHAPTER 13 DEBTORS
## AND THEIR ATTORNEY
### (Business Case)

It is important for debtors who file a bankruptcy case under Chapter 13 to understand their rights and responsibilities. It is also important that the debtors know what their attorney's responsibilities are, and understand the importance of communicating with their attorney to make the case successful. Debtors should also know that they may expect certain services to be performed by their attorney. It is also important for debtors to know the costs of attorneys' fees through the life of a plan. To assure that debtors and their attorney understand their rights and responsibilities in the bankruptcy process, the following rights and responsibilities provided by the United States Bankruptcy Court are hereby agreed to by the debtors and their attorney. (Nothing in this agreement should be construed to excuse an attorney from any ethical duties or responsibilities under Federal Rule of Bankruptcy Procedure 9011.)

## UNLESS THE COURT ORDERS OTHERWISE,

### *The debtor must:*

1. Provide accurate financial information.
2. Provide information in a timely manner.
3. Cooperate and communicate with the attorney.
4. Discuss with the attorney the debtor's objectives in filing the case.
5. Keep the trustee and attorney informed of the debtor's address and telephone number.
6. Inform the attorney of any wage garnishments or attachments of assets which occur or continue after the filing of the case.
7. Contact the attorney promptly if the debtor loses his/her job or has other financial problems.
8. Let the attorney know immediately if the debtor is sued before or during the case.
9. Inform the attorney if any tax refunds the debtor is entitled to are seized or not returned to the debtor by the IRS or Franchise Tax Board.
10. Contact the attorney before buying, refinancing, or selling real property or before entering into any long-term loan agreements to find out what approvals are required.

11. Pay any filing fees and filing expenses that may be incurred directly to the attorney.
12. Pay appropriate attorney's fees commensurate with this agreement and the United States Bankruptcy Court Guidelines regarding Chapter 13 Attorney Fees. If a court order is entered regarding attorney's fees, fees should be paid in accordance with the court's order.

### *To receive $4,350, which is within the United States Bankruptcy Court's parameters for "initial fees," the attorney must:*

1. Meet with the debtor to review the debtor's assets, liabilities, income and expenses.
2. Analyze the debtor's financial situation, and render advice to the debtor in determining whether to file a petition in bankruptcy.
3. Counsel the debtor regarding the advisability of filing either a Chapter 7 or Chapter 13 case, discuss both procedures with the debtor, and answer the debtor's questions.
4. Explain to the debtor how the attorney's fees and trustee's fees are paid.
5. Explain what payments will be made directly by the debtor and what payments will be made through the debtor's chapter 13 plan, with particular attention to mortgage and vehicle loan payments, as well as any other claims with accrued interest.
6. Explain to the debtor how, when, and where to make the chapter 13 plan payments.
7. Explain to the debtor that the first plan payment must be made to the Trustee within 30 days of the date the plan is filed.
8. Advise the debtor of the requirement to attend the § 341(a) Meeting of Creditors, and instruct the debtor as to the date, time and place of the meeting.
9. Advise the debtor of the necessity of maintaining liability, collision and comprehensive insurance on vehicles securing loans or leases.
10. Timely prepare, file and serve the debtor's petition, plan, schedules, statement of financial affairs, and any necessary amendments thereto, which may be required.
11. Prepare a Questionnaire for Chapter 13 Business Owners.
12. Provide documents and information requested by the Chapter 13 Trustee and the Court, including, but not limited to, an itemized list of all business assets and a profit and loss statement for each of the three months prior to the filing.
13. Attend on-site inspections of business at the Chapter 13 Trustee's request.
14. Provide an executed copy of the Rights and Responsibilities of Chapter 13 Debtors and their Attorneys and a copy of the Court's Guidelines regarding Chapter 13 Attorney Fees to the debtor.
15. Appear and represent the debtor at the § 341(a) Meeting of Creditors and any confirmation hearings.
16. Respond to the objections to plan confirmation, and where necessary, prepare, file and serve an amended plan.
17. Assist the Debtor in performing duties pursuant to 11 U.S.C. § 1304, including but not limited to, the filing of periodic operating reports.
18. Provide Certification of Eligibility for Discharge pursuant to Local Bankruptcy Rule 4004-1.
19. Provide such other legal services as are necessary for the administration of the case before the Bankruptcy Court, which include, but are not limited to, a continuing obligation to assist the debtor by returning telephone calls, answering questions and reviewing and sending correspondence.

*Additional services may be required, but are not included in the "initial fees" of $4,350. If necessary and when appropriate, the attorney, at the debtor's request and only with the debtor's cooperation, must provide the following services for "additional fees" described below:*

2

1.  Prepare, file and serve necessary modifications to the plan post-confirmation, which may include suspending, lowering or increasing plan payments.
2.  Prepare, file and serve necessary motions to buy, sell or refinance real property and authorize use of cash collateral or assume executory contracts or unexpired leases.
3.  Object to improper or invalid claims.
4.  Represent the debtor in motions for relief from stay.
5.  Prepare, file and serve necessary motions to avoid liens on real or personal property.
6.  Prepare, file and serve necessary oppositions to motions for dismissal of case.
7.  Provide such other legal services as are necessary for the administration of the case before the Bankruptcy Court, which include but are not limited to, presenting appropriate legal pleadings and making appropriate court appearances.

***Should additional services be provided and "additional fees" requested, the attorney must:***

1.  Provide proper notice in accordance with Federal Rule of Bankruptcy Procedure 2002.
2.  Advise the debtor of all "additional fees" requested and file a declaration with the court stating that counsel has so advised the debtor of the fees requested and the debtor has no objection to the requested fees.

The "Guidelines Regarding Chapter 13 Attorney Fees" provide for "additional fees" within the United States Bankruptcy Court's parameters in the following amounts and include all court appearances required to pursue described actions:

**Modified Plan (Post-Confirmation)**     **$650**

for fees and expenses for services rendered post-confirmation for preparing, filing, noticing, and attending hearings in regard to a debtor's modified plan under section 1329 of the Bankruptcy Code (including the preparation of amended income and expenses statements and providing proof of income). (These fees should be less for modification due to clerical error or other administrative issues.)

**Opposition to Motions for Relief from Stay**

| | | |
|---|---|---|
| **$490** | **(Personal property)** | for fees and expenses of all services rendered in |
| **$625** | **(Real property)** | opposition to motions to modify or vacate automatic stay. |

**Obtaining Orders re: Sale or Refinance of Real Property**

| | | |
|---|---|---|
| **$545** | **(By stipulation or noticed hearing)** | for fees and expenses of all services rendered for order authorizing the sale or refinancing of real estate. |

**Objections to Claim**

| | | |
|---|---|---|
| **$270** | **(Uncontested objections without hearing)** | for fees and expenses of all services rendered for preparing, filing and noticing objections |
| **$380** | **(Contested objections with a hearing)** | to a claim. (Fees must not exceed 50% of the amount the trustee would have otherwise paid.) |

3

**Oppositions to Dismissal/Motions to Avoid Lien/Other**
**Routine Pleadings**                                    **$490**

for fees and expenses of all services rendered for preparing, filing, noticing, and attending hearings in opposition to a motion to dismiss the case, for motions to avoid lien and other routine pleadings.

**Motions to Value Real Property, Treat Claim as**
**Unsecured and Avoid Junior Lien (Lien Strips)**       **$625**

for fees and expenses of all services rendered for preparing, filing, noticing, and attending hearings when there is opposition to a motion to value real property, treat claim as unsecured and avoid junior lien.

**Motions to Impose/Extend Automatic Stay**

| **$380** | **(Unopposed)** | for fees and expenses of all services rendered for |
|---|---|---|
| **$545** | **(Opposed)** | preparing, filing, noticing and attending hearings in |
| | | regard to a motion to impose/extend automatic stay. |

**Novel and Complex Motions and Oppositions to Motions**

These types of motions and oppositions may be billed at hourly rates and counsel must file a fee application in compliance with Federal Rules of Bankruptcy Procedure and Local Bankruptcy Rules 2002 and 2016.

Initial fee charged in this case is $_____

All post-filing fees will be paid through the plan, unless the court orders otherwise. The attorney may not receive fees directly from the debtor other than the initial retainer, unless the court orders otherwise. All "additional fees," as described above, may only be paid upon court authorization after compliance with the "Guidelines Regarding Chapter 13 Attorney Fees." The attorney may seek fees above the additional fees provided a fee application is noticed, filed and approved by the court.

If the debtor disputes the legal services provided or the fees charged by the attorney, the debtor may file an objection with the court and set the matter for hearing. The attorney may move to withdraw or the debtor may discharge the attorney at any time.

Dated:

_____
Debtor

Dated:

_____
Debtor

Dated:

_____
Attorney for Debtor(s)

4

# EXHIBIT 3

Revised: 01/24/13
Name, Address, Telephone No. & I.D. No.

**UNITED STATES BANKRUPTCY COURT**
SOUTHERN DISTRICT OF CALIFORNIA
325 West "F" Street, San Diego, California 92101-6991

| In Re | BANKRUPTCY NO. |
|---|---|
| Last four digits of Soc.Sec. or                    Debtor.<br>Individual-Taxpayer I.D.(ITIN)/Complete EIN: | |

### UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF CALIFORNIA
### RIGHTS AND RESPONSIBILITIES OF CHAPTER 7 DEBTORS
### AND THEIR ATTORNEY

In order for debtors and their attorneys to understand their rights and responsibilities in the bankruptcy process, the following terms of engagement are hereby agreed to by the parties.

Nothing in this agreement should be construed to excuse an attorney from any ethical duties or responsibilities under Federal Rule of Bankruptcy Procedure 9011 and the Local Bankruptcy Rules.

## I.
## Services Included in the Initial Fee Charged

The following are services that an attorney must provide as part of the initial fee charged for representation in a Chapter 7 case:

1.  Meet with the debtor to review the debtor's assets, liabilities, income and expenses.

2.  Analyze the debtor's financial situation, and render advice to the debtor in determining whether to file a petition in bankruptcy.

3.  Describe the purpose, benefits, and costs of the Chapters the debtor may file, counsel the debtor regarding the advisability of filing either a Chapter 7, 11 or 13 case, and answer the debtor's questions.

4.  Advise the debtor of the requirement to attend the Section 341(a) Meeting of Creditors, and instruct the debtor as to the date, time and place of the meeting.

5.  Advise the debtor of the necessity of maintaining liability, collision and comprehensive insurance on vehicles securing loans or leases.

6.    Timely prepare, file and serve, as required, the debtor's petition, schedules, Statement of Financial Affairs, and any necessary amendments to Schedule C.

7.    Provide documents pursuant to the Trustee Guidelines and any other information requested by the Chapter 7 Trustee or the Office of the United States Trustee.

8.    Provide an executed copy of the Rights and Responsibilities of Chapter 7 Debtors and their Attorneys to the debtor.

9.    Appear and represent the debtor at the Section 341(a) Meeting of Creditors, and any continued meeting, except as further set out in Section II.

10.   File the Certificate of Debtor Education if completed by the debtor and provided to the attorney before the case is closed.

11.   Attorney shall have a continuing obligation to assist the debtor by returning telephone calls, answering questions and reviewing and sending correspondence.

12.   Respond to and defend objections to claim(s) of exemption arising from attorney error(s) in Schedule C.

## II.
## Services Included as Part of Chapter 7 Representation,
## Subject to an Additional Fee

The following are services, included as part of the representation of the debtor, for which the attorney may charge additional fees:

1.    Representation at any continued meeting of creditors due to client's failure to appear or failure to provide required documents or acceptable identification;

2.    Amendments, except that no fee shall be charged for any amendment to Schedule C that may be required as a result of attorney error;

3.    Opposing Motions for Relief from Stay;

4.    Reaffirmation Agreements and hearings on Reaffirmation Agreements;

5.    Redemption Motions and hearings on Redemption Motions;

6.    Preparing, filing, or objecting to Proof of Claims, when appropriate, and if applicable;

7.    Representation in a Motion to Dismiss or Convert debtor's case;

8.    Motions to Reinstate or Extend the Automatic Stay;

9.    Negotiations with Chapter 7 Trustee in aid of resolving nonexempt asset, turnover or asset administration issues.

2

## III.
## Additional Services Not Included in the Initial Fee Which Will Require a Separate Fee Agreement

The following services are not included as part of the representation in a Chapter 7 case, unless the attorney and debtor negotiate representation in these post-filing matters at mutually agreed upon terms in advance of any obligation of the attorney to render services. Unless a new fee agreement is negotiated between debtor and attorney, attorney will not be required to represent the debtor in these matters:

1.  Defense of Complaint to Determine Non-Dischargeability of a Debt or filing Complaint to Determine Dischargeability of Debt;

2.  Defense of a Complaint objecting to discharge;

3.  Objections to Claim of Exemption, except where an objection arises due to an error on Schedule C;

4.  Sheriff levy releases;

5.  Section 522(f) Lien Avoidance Motions;

6.  Opposing a request for, or appearing at a 2004 examination;

7.  All other Motions or Applications in the case, including to Buy, Sell, or Refinance Real or other Property;

8.  Motions or other proceedings to enforce the automatic stay or discharge injunction;

9.  Filing or responding to an appeal;

10. An audit of the debtor's case conducted by a contract auditor pursuant to 28 U.S.C. Section 586(f).

## IV.
## Duties and Responsibilities of the Debtor

As the debtor filing for a Chapter 7 bankruptcy, you must:

1.  Fully disclose everything you own, lease, or otherwise believe you have a right or interest in prior to filing the case;

2.  List everyone to whom you owe money, including your friends, relatives or someone you want to repay after the bankruptcy is filed;

3.  Provide accurate and complete financial information;

4.  Provide all requested information and documentation in a timely manner, in accordance with the Chapter 7 Trustee Guidelines;

5.  Cooperate and communicate with your attorney;

3

6. Discuss the objectives of the case with your attorney before you file;

7. Keep the attorney updated with any changes in contact information, including email address;

8. Keep the attorney updated on any and all collection activities by any creditor, including lawsuits, judgments, garnishments, levies and executions on debtor's property;

9. Keep the attorney updated on any changes in the household income and expenses;

10. Timely file all statutorily required tax returns;

11. Inform the attorney if there are any pending lawsuits or rights to pursue any lawsuits;

12. Appear at the Section 341(a) Meeting of Creditors, and any continued Meeting of Creditors;

13. Bring proof of social security number and government issued photo identification to the Section 341(a) Meeting of Creditors;

14. Provide date-of-filing bank statements to the attorney no later than 7 days after filing of your case;

15. Pay all required fees prior to the filing of the case;

16. Promptly pay all required fees in the event post filing fees are incurred;

17. Debtor must not direct, compel or demand their attorney to take a legal position or oppose a motion in violation of any Ethical Rule, any Rule of Professional Conduct, or Federal Rule that is not well grounded in fact or law.

Dated:

_____
Debtor

Dated:

_____
Debtor

Dated:

_____
Attorney for Debtor(s)

4

# EXHIBIT 4

# NOTICE REGARDING VERIFICATION OF SOCIAL SECURITY NUMBERS

Section 521(h) of the Bankruptcy Code requires debtors to provide to the trustee assigned to their case, proof verifying the accuracy of the social security number disclosed in the bankruptcy case.  The United States Trustee is charged with establishing which documents can be produced that satisfies this requirement.

Effective immediately, only the following documents may be used as proof to verify the debtor's social security number:

1.  Social Security Card (original only, no copy permitted)

2.  Medical Insurance Card (original only, no copy permitted)

3.  Social Security Administration Statement (original only, no copy permitted), must contain complete unredacted social security number

4.  I.R.S. Form W-2 (Wage and Tax Statement) (copy accepted at discretion of case trustee)

5.  I.R.S. Form 1099 (copy accepted at discretion of case trustee)

6.  Recent Pay Stub (copy accepted at discretion of case trustee)

DO/tt 102715

# EXHIBIT 5

## CHAPTER 13 ADMINISTRATION GUIDELINES
## SOUTHERN DISTRICT OF CALIFORNIA

### A. Policy Regarding Debtor's Attendance At Meeting Of Creditors:

Debtors are expected to attend the initial Meeting of Creditors and, unless excused by the Trustee, any continued Meeting of Creditors. The Chapter 13 Trustee does not have the authority to excuse the debtor from attending his or her initial Meeting of Creditors. Special accommodations that are acceptable to the United States Trustee may be available where the debtor is unable to attend his or her initial Meeting of Creditors due to the following:

1. The debtor is incarcerated; or
2. The debtor is unavailable due to extended military assignment (i.e., at sea or stationed overseas); or
3. The debtor is seriously ill and the Trustee has received evidence of such from the debtor's attending physician.

Please notify the U.S. Trustee of the date, time and location of the 341 Meeting (or continued 341 Meeting) and the specific circumstances respecting why the debtor cannot attend the Meeting of Creditors. The Chapter 13 Trustee should be copied on such email request.

### B. Identification: At the 341(a) Meeting, pursuant to 11 USC § 521 (h)(1) and (2), each individual debtor must present original government issued photo identification and confirmation of the social security number. Any document used must be an original except that a copy of a W-2 Form, an IRS Form 1099, third-party prepared Federal income tax return or a recent payroll advice may be accepted to confirm debtor's social security number. Acceptable forms of picture identification (ID) include: driver's license, U.S. government ID, state ID, passport (and current U.S. visa, if not a U.S. citizen), military ID, resident alien card, and identity card issued by a national government authority. Acceptable forms of proof of Social security number include: social security card, medical insurance card, pay advice, W-2 Form, IRS Form 1099, third-party prepared Federal income tax return and Social Security Administration (SSA) Statement.

### C. Attorney Responsibilities: Attorney representing debtors at the Meeting of Creditors must have the debtor's file and backup documents and be familiar with the case to assist the debtors in responding to questions of the Trustee and/or creditors.

The use of special appearance counsel for a debtor is highly discouraged. In the rare instance where an attorney makes a special appearance for debtor's counsel, the attorney appearing specially on behalf of a debtor must fulfill the following requirements for the matter to proceed to examination:

1. Must be fully prepared and knowledgeable of the particular facts and issues in the debtor's case;
2. Must be in possession of the original file of the debtor in the case;
3. Must have discussed the case with the attorney of record;
4. Must have met with the debtor prior to the time of the scheduled creditor meeting at a place and time other than the 341(a) room environs just prior

the 341(a) Meeting. "Meeting with the debtor" does not include telephonic
meetings.

If the special appearance attorney cannot comply with all of the above conditions the
meeting may be continued for the attorney of record to appear.

## D. Supporting Documentation Must Be Sent Via E-DOC[2] to Trustee As Soon After Case Filing as Possible But At Least Seven (7) Days Prior to the 341(a) Meeting:

5.  Proof of Income: Copies of all pay advices, or other documentation of the
debtor upon which the computation of trailing six (6) month income was based (if debtor is
self-employed copies of profit & loss statements and bank statements). **If debtor(s) are
wage-earners – the last paycheck in the pay period seven months prior to filing and the
last paycheck for December (where applicable) end of year prior to filing and the last
paycheck in the month prior to filing with YTD information – see Exhibit "A".**

6.  Value of Vehicles: Written documentation as to the basis for valuation of
motor vehicles. In this regard a Statement of Value can be easily obtained via Internet at
www.kbb.com or www.nadaguides.com and is the preferred source of valuation.

7.  Value of Real Property: A Broker's Price Opinion is the preferred method of
providing current valuation of real property. Although not preferred, current valuation
information may also be obtained from a few online resources. Debtors and debtors'
attorney are directed to the Internet where it is possible obtain comparable sales as to San
Diego County properties by going to the County of San Diego web site
(www.sdcounty.ca.gov), clicking on "Property Sales Search" on the debtor's street, etc., and
entering the street name (not the full address) to discover recent sales. If the County
Assessor information does not have a current date, the Trustee may request the use of
additional sites such as, Bank of America (http://realestatecenter.bankofamerica.com), Zillow
(www.zillow.com) or Cyberhomes (www.cyberhomes.com). Comparable reports are
acceptable only if reasonable ranges of value are presented with recent identifiable
comparable properties.

8.  Trust Documents: Copies of any Trust instruments in which the debtor has an
interest of any type, i.e., beneficial or fiduciary;

9.  Proof of Insurance-Motor Vehicles and Real Property: Copy of proof of
insurance, (i.e., declarations page, etc.) documenting the extent of coverage on motor
vehicles and real property. The Proof of Liability Insurance card is insufficient to
demonstrate full coverage;

10. Business Operations: Six (6) months Profit and Loss Statements and
corresponding bank statements demonstrating receipts and disbursements for the previous six
(6) months prior to filing; copy of proof of insurance for any debtor operating a business
including liability, casualty, workers compensation and error and omissions if self
employment continues, business questionnaire (**Exhibit "B"**) and last two (2) years of
business tax returns. For defunct corporations, copy of corporate status from Department of
Corporations. If applicable, provision for quarterly operating reports to the Trustee;

---

[2] For Trustee Billingslea continued §341 matters only, please submit Supporting Documents via email at
legalmail@thb.coxatwork.com.

11. Domestic Support Orders (DSO): In order for the Trustee to fulfill his or her
duties pursuant to 11 USC §§704(10)(a) and 1302(d), provide the name, address and
telephone number of a support claimant, as well as a copy of the Domestic Support Order.
The debtor should affirm in writing that such information is correct. **Where applicable,
provide a copy of the Marital Settlement Agreement and Qualified Domestic Relations
Order. All DSO creditors must be scheduled on Schedule E even if payments are
current.**

12. Tax Returns: Copy of last two years federal income tax returns **and last W2
and/or 1099s, if any. If applicable, copy of last two years of business tax returns**.

13. Retirement accounts:  Copy of most recent statement showing balances held
in retirement accounts and, most importantly, the current balance of any loans against 401(k)
or similar retirement accounts. **When completing the B22 the mandatory deduction for
retirement loan accounts is the payoff balance divided by 60 months.**

14.  Payoff balances – real and personal property:  The most recent billing
statement/ invoice showing the principal balance due on any arrears, equity line, vehicle loan,
etc. **When completing the B22 the deduction is the payoff balance on the real property
arrears and/or personal property divided by 60.**

15. Disclosure of When Debtor Incurred Debt:  Schedules D, E, & F require the
debtor to provide "date claim was incurred."

16. Claim of Exemption:  CCP 703.140(a)(2) requires a married debtor filing
without the spouse to elect the exemptions under CCP 704 et.seq., unless the non-filing
spouse executes a written waiver.  A sample Waiver form is attached as **Exhibit "C."**  The
Waiver is to be filed with the Court and served upon the Trustee.

17. Questionnaires to be Completed and Delivered at Creditors Meeting:  A
Questionnaire has been developed for individual debtors (**Exhibit "D"**) and
Partnership/Corporate debtor (**Exhibit "E"**) to address certain inquiries that the Trustees
believe will facilitate the examination of debtors.  Debtors must personally execute (fill out)
the appropriate Questionnaire and deliver such to the Trustee at the Creditor Meeting.

18. Unincorporated Self-Employed, Professionals, and Business Cases:
   a. Evidence of current insurance coverage in connection with the operation
      the business;
   b. Evidence of current Worker Compensation insurance in connection with
      the operation of the business, if applicable
   c. Evidence of current Error and Omissions insurance coverage, if
      applicable.

15. Where the Chapter 13 debtor is a Partner/Member of an LLC or Shareholder:
   a. Minute Book should be available for inspection;
   b. Tax returns of the entity for the past two years;
   c. Income and Expense and Balance Sheet for past one (1) year;
   d. Bank Statements and check register for past six (6) months.

**E. Guidelines for Pre-Confirmation and Post-Confirmation Chapter 13 Plan Modification Forms:** These forms are intended to be used for last minute simple interlineations to a Plan. As such, the form should only be used in situations where interlineation without notice is appropriate. Notice is not required to change the terms of a Plan when the modification benefits all parties. If the proposed modification will adversely affect any party, a new modified Plan must be filed and served in accordance with local rules.

Examples when a modification will benefit all parties include but are not limited to:

> (i) Increasing the Plan payment;
> (ii) Increasing the percentage and/or pro rata to be paid on allowed unsecured claims;
> (iii) Providing interest to be paid on all unsecured claims; and,
> (iv) Increasing the interest rate to a secured claim where the percentage to be paid on unsecured claims was (0%) zero.

Examples when a modification will not benefit all parties include but are not limited to:

> (i) Decreasing the Plan payment or percentage to unsecured claims;
> (ii) Excluding a claim from the Plan;
> (iii) Adding a claim to any numbered paragraph of the Plan and,
> (iv) Any change which will result in extending the commencement of distributions to any other claims.

**F. Policy on Barebones Filings:** When the Chapter 13 Schedules and Plan are received by the Chapter 13 Trustees concurrently with the Petition, the Clerk of Court via the National Noticing Center (i) serves notice to the creditors that a Petition has been filed; (ii) serves a photocopy of the Plan; (iii) indicates the §341(a) Hearing Date; and (iv) provides a blank Proof of Claim form for each creditor.

However, the same is not true when the Schedules or Plan is received by the Chapter 13 Trustee at a later date than the Petition. Under those circumstances, the Clerk of Court only notices that a Petition has been filed. It is up to the debtor or his/her attorney to ensure service of: (1) a copy of the Plan; (2) notice of a pending 341(a) hearing; and (3) a blank Proof of Claim upon added creditors at least 28 days prior to the scheduled 341(a) hearing date. A Proof of Service will need to be submitted to the Trustee's office prior to the 341(a) hearing.

As numerous reported cases have made it clear, the debtor bears the burden of proof that a Plan is being proposed in good faith. A debtor who does not wish to notice a Plan to parties in interest is, in both offices' view, not acting in good faith.

**G. Calculation of First Payment Date in Bare Bone Filing Post BAPCPA:** With respect to a bare bone filing, the first payment is due 30 days after the case is filed §1326(c)(1).

**H. Pay Stubs-Notation of Pay Period:** Paycheck stubs for the last 60-day period are required of all debtors with W-2 incomes. Unless it is clear from the documents, please indicate on the paycheck stub whether the pay period is weekly, bi-weekly, bi-monthly, etc. Note – in Chapter 13 cases, pay information for the six (6) month preceding the filing is required. Not every pay stub is needed if year-to-date (YTD) information can be used to

calculate the six months of income (see Paragraph **D 1** above). **Separate pay advices covering a 60-day period must be submitted if the year to date is less than 70 days.**

**I. Recreational Expenses in Zero or Nominal Percentage Plans:** Recreational expenses in zero or nominal percentage plans are highly scrutinized. Also including a recreational asset in the Plan may not be appropriate and payment for such related expenses does not count towards meeting the minimum pro-rata distribution to unsecured creditors.

**J. B22 Considerations**:

> 1. Expenses on B22 Part IV: Provide evidentiary proof of all expenses listed in Part IV which exceed the local standards and/or where such evidence has not otherwise been provided to the Trustee.

> 2. Determinations of Applicable Commitment Period (ACP) and Disposable Income: The pro rata provided to unsecured creditors is determined from line 59. Line 59 is multiplied by 60 months where the debtor is above-median. If line 59 is negative, according to *In re Maney v. Kagenveama*, 541 F.3d 868 (9th Cir. 2008) there is no commitment period; however **CAVEAT**, *In re Hamilton v. Lanning*, 130 S.Ct. 2464 (2010) allows the courts to view projected disposable income where a change is virtually certain to affect the remainder of the plan. In such situations, the Trustee will require current pay information from the date of filing to the date of the changed circumstance and up to the date of any continued hearing. The income on the B22 should not differ substantially from the income on Schedule I absent competent documentary evidence to the contrary. Any additional expenses on the B22 which are subject to proof, will be scrutinized and documentary evidentiary proof must be provided to the Trustee. Where the debtor is below-median, the ACP is 36 months. Where there is a significant pre-confirmation change in circumstances that will affect the debtor's income and expenses during the plan, the Trustee will require competent evidentiary proof, including but not limited to current pay information with YTD information, current proof of disability, workers' compensation, etc. (see "Statement of the U.S. Trustee Program's Position on Legal Issues Arising Under Chapter 13 Disposable Income Test" (Rev'd on April 20, 2010) **Exhibit "F"**)).

**K. Excluding a Creditor**: If you properly exclude a creditor from Paragraph 15, the Trustee may want a step-up in plan payment after the obligation to such excluded creditor is paid. Only fully secured creditors can normally be excluded, provided however if the claim is impaired, the Trustee will request that the claim be provided for in the Plan. *In re Fulkrod v. Barmettler*, 126 B.R. 584 (9th Cir. BAP 1991).

**L. Reject and Return/ Surrender of Collateral**: These expenses may not be claimed in B22 Part IV at line 47 or 48.

**M. Self-Employed Debtors:**

> 1. Trustee's Pre-Confirmation Report- §1302(c) Statement of Investigation: Following submission of review of the above information, the Trustee may file with the Court a Statement of Investigation indicating the scope of his review and any items which remain outstanding.

Size Threshold: Generally, the Trustee will not file the Statement unless the debtor is self-employed, *incurs trade debt* and at least 51% of his or her gross earnings are derived from self-employment.

2. Debtor's Completion of Semi-Annual Business Operating Report: Where requested by the Chapter 13 Trustee, the debtor shall also respond and complete the Annual Business Operating Report **Exhibit** "**G**". Such completed Report shall be returned to the Trustee within sixty (60) days of the end of the designated reporting period for that given case. The Trustee may bring a motion for material breach in the event the debtor fails to deliver to the Trustee such completed Report. See 11 U.S.C. §1307.

Size Threshold: A self-employed debtor with monthly gross earnings of $10,000 or more, or who employs more than five employees, may be required to complete such Report annually. Other self-employed debtors may also be requested to complete the Annual Business Operating Report during the pendency of their case.

## N. Ex-Parte Attorney Fee Application:

1. Dismissed Cases: Where a case has been dismissed for failure of the debtor to appear at the 341(a) Meeting, or continued meeting, the debtor's attorney must submit any Ex-Parte Attorney Fee Application within two (2) days of the hearing at which the case was dismissed. Such application shall seek the acquiescence of the Chapter 13 Trustee who may indicate that he has "no opposition" to such request. The Chapter 13 Trustee will only hold funds on hand where he has (i) been timely served such fee application and (ii) has indicated "no opposition" on such application. In the absence of the foregoing, the debtor's counsel may seek payment of awarded fees from the debtor directly.

2. FRBP 2002(a)(6) provides for at least 20 days notice to Creditors and the Trustee for requests for compensation if the request exceeds $1,000. The Chapter 13 Trustee will review and sign-off on ex-parte fee applications that seek less than a $1,000 for matters such as Relief From Stay Motions, Motions to Dismiss, Objections to Claims, etc. that settle prior to a hearing. The application must pray for a fee that meets the Southern District of California Bankruptcy Court Guidelines re Chapter 13 Attorney Fees or include an itemized account of services perform and time expended.

**O. Motions to Dismiss for Non-Payment—Debtor Cure**: If a Motion to Dismiss has been filed, and subsequently the debtor becomes current, *it is the debtor and Debtor's counsel's responsibility to notify the Trustee's office that the debtor is no longer in arrears and to request that the Motion to Dismiss be withdrawn.* Once a Motion to Dismiss has been filed, in the absence of it being withdrawn, the debtor must request a hearing date. Where the debtor fails to request a hearing date or has failed to obtain in writing or by e-mail Trustee's agreement to withdraw the Motion, a dismissal order will still be submitted to the Court notwithstanding any cure by the Debtor of Plan payments. **Caveat: the Trustee may not always agree to withdraw a Motion to Dismiss even if all payments are brought current.**

**P. Request for Discharge and Certification of Eligibility for Completed BAPCPA Case**:
After the Trustee files his Interim Final report (but not before), the debtor should file a Notice of Motion for Discharge and Certification of Eligibility for Discharge with service upon all interested parties. Form CSD 2120 should be used.

**Q. Application for Confirmation of Plan; Order Confirming Plan and Allowing
Attorney's Fees.** BLR 3015-10 requires the Attorney for the debtor to prepare and upload to
the Chapter 13 Trustee at the conclusion of the §341(a) meeting the proposed Order
Confirming the Chapter 13 Plan. If a hearing on objections to confirmation results in the plan
being confirmed, Debtor's Attorney is required to upload the proposed Confirmation Order to
the Chapter 13 Trustee at the conclusion of the hearing. Because the Order Confirming the
Plan is also a fee application the Chapter 13 Trustee will not submit an order to the Court that
provides for fees in excess of the Southern District of California Bankruptcy Court Guidelines
re Chapter 13 Attorney Fees. If the order provides for fees in excess of the guidelines fees the
order will be returned to the Attorney for appropriate correction. If no order is received that
can be submitted to the Court, the Trustee may upload an order confirming the plan without a
fee award and the Attorney will then be required to bring an appropriate fee application.
Please review the Court's website and online CM/ECF Manual on instructions for the
uploading (or electronically filing) of Confirmation Orders. Forms CSD 1177 or 1178 should
be used as updated by the Court. The Trustee's office will also confirm the actual Order for
the Motion to Value (Lien Strip) has been entered on the docket. If not yet entered, the E-
Order cannot be accepted. The Trustee's office will also verify that the date on the Plan
and/or PCM in the E-Confirmation Order reconciles with that of the filed pleadings. (A
common error is to reference the docket entry date or to include the date of the initial plan that
has been superseded by a subsequent amended plan). **If you fail to timely upload your order
for confirmation, the Chapter 13 Trustee will consider bringing a sanctions motion or
OSC.**

# EXHIBIT 6

# "WHAT DO YOU MEAN, I FILED BANKRUPTCY?" - OR HOW THE LAW ALLOWS A PERFECT STRANGER TO PURCHASE AN AUTOMATIC STAY IN YOUR NAME

### *Maureen A. Tighe\* and Emily Rosenblum\*\**

In early 1995, Pearl Simpson[1] discovered offenses she did not commit listed on her driving record in California, where she no longer lived.[2] She spent over two months trying to clear her driving record.[3] At the time she thought the problem was merely a clerical error by the authorities back in California.[4] In June of 1995, however, Pearl Simpson learned it was not just her driving record that had been injured. When she attempted to use her credit card to make a purchase, to her surprise, the store turned her down. Puzzled, she called a representative from the credit card company who told her that the account was blocked because a bankruptcy petition had been filed in her name.[5]

---

\* United States Trustee for Region 16, the Central District of California. Ms. Tighe was previously the Deputy Chief of the Major Frauds Section in the Office of the United States Attorney and Coordinator of the Bankruptcy Fraud Task Force for ten years. The views expressed herein are those of the author and may not be considered the official policy or views of the Department of Justice.

\*\* Loyola Law School, Los Angeles, J.D. candidate May 1999.

1. All descriptions of fraud scenarios are from actual incidents reported to the United States Trustee. Victim names have been changed to protect their identity from any further abuse. Real perpetrator names have been used where a case is in the public record and a conviction has been obtained.

2. *See* Statement of Victim, Federal Bureau of Investigation (FBI) File at 2 (June 30, 1995) (on file with *Loyola of Los Angeles Law Review*).

3. *See id.*

4. *See id.*

5. *See id.*

Soon Pearl Simpson learned that Carolyn Lynn Robinson had obtained her driver's license and social security number when Robinson worked for a college that Simpson attended years before in California.[6]  Robinson had been using Simpson's personal identification information since 1992 when Robinson rented an apartment in Van Nuys, California.[7]  She also used Simpson's information to open an account with MCI, accumulating an unpaid bill of nearly $1,000.[8] When Robinson defaulted on her rent along with all other obligations and finally faced eviction, she simply filed bankruptcy in Pearl Simpson's name in order to postpone the eviction process and live another few months rent free.

Fortunately, the Federal Bureau of Investigation was able to track down the person posing as Pearl Simpson, and Robinson was convicted of bankruptcy fraud and use of a false social security number.[9]  Robinson found continued free rent at a federal prison and Simpson is continuing to try and clear her name.

Unfortunately, Pearl Simpson's nightmare is representative of many identity frauds carried out in the bankruptcy courts.  It is easier to file bankruptcy than it is to obtain a library card - and the "loan" of an automatic stay can be much more valuable than the latest best-seller.  Currently, when a person files bankruptcy, there is nothing to check that the person identified as the debtor on the bankruptcy petition is actually the individual authorizing the filing.  There are no rules allowing a court clerk to ask for photo identification from the person filing or to verify that the name on the petition matches the social security number given.  In fact, even if the filing clerk knows that the filer is not the person he or she claims to be, and that the social security number on the petition belongs to someone else, it is not clear that the clerk has the authority to reject the filing.  So the filing will effectively act as a temporary injunction against any lawsuit pending against the bankruptcy filer and the bankruptcy will be recorded for all time in the name of the person listed on the petition.

---

6.  *See* Federal Bureau of Investigation Report, FBI File at 52 (Oct. 21, 1996) (on file with *Loyola of Los Angeles Law Review*).

7.  *See id.*

8.  *See* Schedule F, Creditors holding unsecured nonpriority claims, FBI File at 35 (June 16, 1995) (on file with *Loyola of Los Angeles Law Review*).

9.  *See* Indictment, United States v. Robinson, No. CR 96-153 (C.D. Cal. 1995) (on file with *Loyola of Los Angeles Law Review*).

The ability to buy an automatic stay in anyone's name for the price of a filing fee[10] allows a credit card thief to exhaust the victim's credit and file bankruptcy in the victim's name in order to further elude creditors. It also allows unscrupulous "foreclosure consultants" to concoct elaborate schemes to scam either homeowners facing foreclosure or lenders attempting to foreclose with no way of knowing who is orchestrating the bankruptcy filings.

Although most of these fraudulent bankruptcies are eventually dismissed because no one attends the required hearings, these filings still have a tremendous impact on their victims. The consequences of a false bankruptcy filing have a devastating effect on a person's life. Time and money are needed to clear a credit report of the filing and, even where the credit reporting agency clears the record, the problem continues to resurface regularly. The victim also must convince the bankruptcy court that the filing is indeed fraudulent. This may entail hiring an attorney and, often, traveling across the country to the place where the bogus bankruptcy was filed. Some people may not have the resources to clear their record or the process may be too slow to allow them to purchase the car or home they need.

Take for example the case of Joe.[11] Joe was a nineteen-year-old college student attending State University studying math, with ambitions of becoming a professor. He went to the financial aid office one spring to check on his student loan for the fall. He was shocked to find out the University had turned down his request because of a bankruptcy on his credit report. Joe had never filed bankruptcy. He asked the Financial Aid clerk to re-check. She pulled out his file and showed him his credit report. Sure enough, there was a bankruptcy filing.

After getting over his disbelief, Joe contacted the credit agency. Joe's wallet had been stolen earlier that year. He had always kept his social security card in his wallet. The representative at the credit reporting agency said he would note Joe's complaint in the file, but the agency could not remove the bankruptcy because Joe could not

---

10. The current filing fee for Chapter 7 is $135. *See* 28 U.S.C. § 1930(a)(1) (1994).

11. This fact scenario is based on information supplied to the Office of the United States Trustee's Fraud Section in Los Angeles by the victim (on file with *Loyola of Los Angeles Law Review*).

prove someone else had filed in his name.  During this period, he was also turned down for a credit card and the apartment he was planning to share with a friend.  Without a student loan, Joe could not attend the university.  Now two years later, Joe is working at a 7-Eleven.

While the problem of identity theft has received some long-overdue attention in recent years, its impact in bankruptcy has gone virtually unnoticed apart from a small circle of law enforcement personnel, bankruptcy judges, trustees, and United States Trustees.  This Article examines the problem of identity theft in the context of bankruptcy.  Part I discusses the types of identity theft schemes which result in fraudulent bankruptcy filings.  Part II examines current federal and state laws that protect victims of identity theft and how the laws do not offer much assistance in the context of bankruptcy.  Part III proposes possible deterrents to the problem.

## I. IDENTITY THEFT AND BANKRUPTCY

Although no formal study exists on the prevalence of identity theft, there is little doubt that it is on the rise.[12]  In 1992, the credit reporting agency, Trans Union, reported 35,000 complaints regarding identity theft.[13]  In 1997 that number rose to 523,000![14]

Like most societal problems, this rapidly growing crime rears its head in bankruptcy proceedings.[15]  Not only do identity thieves use their victims' credit, they may also file bankruptcy in their victims' names.  A review of bankruptcy identity theft complaints filed with the U.S. Trustee in Los Angeles indicates that the problem is severe and getting worse.  The Fraud Section of the United States Trustee's Office received sixty-eight identity theft complaints in 1995, ninety-nine in 1997, and eighty-eight such complaints in 1998.[16]  While

---

12. *See* Maria Ramirez-Palafox, *Identity Theft on the Rise: Will the Real John Doe Please Step Forward?*, 29 MCGEORGE L. REV. 483, 483 (1998).

13. *See* Michael Higgins, *Identity Thieves*, A.B.A. J., Oct. 1998, at 42, 43.

14. *See id.*

15. There were 1.44 million bankruptcy filings in 1998.  *See Bankruptcy Statistics: Another Record Year for Bankruptcy Filings, But Increase Slowed From Previous Year*, BNA BANKR. LAW DAILY, Mar. 10, 1999, at D3.

16. *See* Memorandum from the Fraud Section, Office of the United States Trustee, Los Angeles, (Feb. 6, 1998) (on file with *Loyola of Los Angeles Law Review*).  These complaints generally comprise about 22% of all bankruptcy

these numbers may not seem high, it should be kept in mind that most victims of identity theft would have no idea how to file a complaint or where to file it.[17] Local police departments usually will not take a complaint involving bankruptcy because it is considered an exclusively federal problem. United States Trustees around the country as well as federal prosecutors report that filing bankruptcies in false names and social security numbers is a growing problem in many areas such as Illinois, Texas, New Jersey, and Florida.

An identity thief may have various motives for filing bankruptcy in another's name. A person who has stolen another's identity and then exhausted that person's credit may file bankruptcy under the victim's name in order to elude creditors who may be able to trace the thief.[18]

For example, Jerome Joseph Griesmer was recently charged in Abilene, Texas with filing bankruptcy in his victim's name a second time.[19] His victim, the real Richard Pike, endured Griesmer's use of his identity since 1964 when Pike's wallet was stolen at a state fair.[20] Griesmer used Pike's identity for years, held himself out as Pike and even bought a car in Pike's name. Griesmer ruined Pike's credit to such an extent that he filed bankruptcy in his assumed name first in 1996 and again in 1998.[21]

Another popular scam involves the thief convincing homeowners who are facing foreclosure to use the thief's "service" to "refinance" their mortgage.[22] The thief then files bankruptcy listing the property, using either the name or social security number of the

---

fraud complaints received. *See id.*

17. Most members of the public appear to be unaware of the office of the United States Trustee, especially if they have no significant contact with the bankruptcy system, so they do not know where to complain when they are victimized by this crime.

18. *See* Patrice Apodaca, *Bankruptcy Filers Have Photos Taken*, L.A. TIMES, Apr. 27, 1997, at A3.

19. *See* Criminal Complaint, United States v. Greismer, Case No. 1:99.M013 (N.D. Tex. 1999) (on file with *Loyola of Los Angeles Law Review*).

20. *See id.* at 3 (affidavit of FBI Special Agent Michael Morris, accompanying complaint).

21. *See id.* at 1.

22. *See* Jane Limprecht, *For $800 and the Deed to Your Home: Bankruptcy Foreclosure Scams Target Distressed Homeowners*, 17 AM. BANKR. INST. J. 14, 14 (Oct. 1998).

victim.[23]  When the bankruptcy is filed, an automatic stay is invoked, preventing the mortgage holder from foreclosing.[24]  By this point, the victim may have paid the thief between $250 and $850 up front or made payments over several months.[25]  Because of the automatic stay, the victim no longer receives collection calls and, therefore, may believe the service has worked.[26]  However, when no one shows up at the hearing scheduled after the bankruptcy filing, the bankruptcy is dismissed and the foreclosure process continues.[27]

A variation of this scam involves a perpetrator filing bankruptcy in another's name or using a false social security number in order to stay an impending eviction.  For example, in 1992, an indictment was brought against Norman and Ivanna Flores for conspiracy and perjury for concocting a scheme that bilked innocent renters out of money.[28]  Mr. and Mrs. Flores set up a business that claimed to help renters on the verge of eviction.  They solicited tenants who were behind on their rent by leaving flyers at apartment buildings.[29]  They even convinced tenants who were current on their rent to go on a "rent strike" and then would offer their service when the tenant faced eviction.[30]  Ivanna and Norman Flores would then file bankruptcy in the name of the tenant.[31]

In some cases they had the tenants sign blank bankruptcy petitions.[32]  Mr. and Mrs. Flores did not explain to the non-English speaking tenants the nature of the documents the tenants were signing.[33]  Instead, they told the tenants only that the paper work would

23. *See id.*
24. *See* 11 U.S.C. § 362 (1994).
25. *See* Limprecht, *supra* note 22.
26. *See id.*
27. *See id.*
28. *See* Indictment, United States v. Flores (C.D. Cal. 1992) (on file with *Loyola of Los Angeles Law Review*).
29. The husband and wife team left flyers written in both Spanish and English that stated, "We can help you!!! . . . We can prolong your stay in your home from 20 to 45 days, we do all the leg work!!! . . . We take care of everything . . . It just takes you 10 minutes!" *See id.* at 7-8.
30. *See id.* at 8.
31. *See id.*
32. *See id.*
33. *See id.*

hold off the eviction.[34]  Additionally, they used false social security numbers in the petitions, even when the tenants provided their real ones.[35]  Mr. and Mrs. Flores charged their victims between $120 and $300 for the "service."[36]

While identity theft is a significant problem in this country, the fraudulent use of a person's identity in a bankruptcy takes on an added element of outrage for its victims because it is the nature and structure of the federal bankruptcy laws and rules that make the crime possible.  The identity thief, by using the automatic stay and the official court record of the filing, enlists the federal bankruptcy court as an unwitting aider and abettor of the crime.  Without the automatic stay, there would be no advantage to most identity thieves in filing a bankruptcy.  Although there are many advantages to the current legal framework based on the automatic stay provisions, this is one result which appears not to have been contemplated.

## II.  CURRENT IDENTITY THEFT LAW

Current law adequately provides for the punishment of those who use false names and social security numbers to file bankruptcy.  New state and federal laws address other aspects of identity fraud and attempt to provide better remedies for victims.  However, neither the established laws nor recent legislation address the need to prevent people from filing under false names and social security numbers in the first place.

### A.  Federal Law

On October 30, 1998, President William J. Clinton signed the Identity Theft and Assumption Deterrence Act.[37]  The Act is intended to address the growing problem of identity theft and the effects the crime has on the victim.  Prior to the Act, federal law criminalized the "fraudulent use of identification documents" but not the "unlawful . . . use of personal identity information" such as a social

---

34.  *See id.*

35.  *See id.* at 9.

36.  *See id.* at 8.

37.  *See* Identity Theft and Assumption Deterrence Act of 1998, Pub. L. No. 105-318, 112 Stat. 3007 (1998); Kathy M. Kristof, *New Law to Assist Victims in Fight Against Identity Fraud*, L.A. TIMES, Oct. 31, 1998, at C1.

Case 16-07541-LT13    Filed 04/20/17    Entered 04/20/17 22:11:26    Doc 19    Pg. 53 of 65

1016          *LOYOLA OF LOS ANGELES LAW REVIEW*   [Vol. 32:1009]

security number.[38]  Prior federal law viewed the victim of identity theft as the creditor.[39]  Consequently, the creditor—not the person whose identity was stolen—was offered recourse under the law. Creditors found it more economical to deal with losses by either writing them off or increasing interest rates rather than bringing an action against the criminal.[40]  Therefore, the federal laws were more or less ineffective in curtailing the perpetrators of identity theft.

Before the Act became effective, identity thieves assumed their victims' identity and used their victims' credit with reckless abandon.[41]  The activities of identity thieves went unchecked because creditors chose not to enforce their legal rights, and victims of identity fraud had no recourse under the law.  According to the United States Secret Service, the dollar value of identity theft cases almost doubled from $450 million in 1996 to $745 million in 1997.[42]  This increase in the crime resulted in more and more victims bearing the cost of restoring their own credit.[43]

With the actual victims of the crime in mind, Congress, through the Identity Theft and Assumption Deterrence Act, sought to address the losses that these victims suffered.  The Act makes it a crime to "knowingly transfer or use [], without lawful authority, a means of identification of another person with the intent to commit, or to aid

---

38. *Identity Fraud: Hearings on S. 512 Before the Subcomm. on Technology, Terrorism, and Government Information of the Senate Comm. on the Judiciary*, 105th Cong., *available in* WESTLAW 1998 WL 2577481998 [hereinafter *Identity Fraud Hearings*] (statement of Chairman Jon Kyle).

39. *See Identity Fraud Hearings*, *supra* note 38, *available in* WESTLAW 1998 WL 11518411 (statement of David Medine of the Federal Trade Commission).

40. *See Are You a Target for Identity Theft?*, CONSUMER REPORTS, Sept. 1997, at 10.

41. *See* Kristof, *supra* note 37, at C3 (discussing identity theft victim Bob Hartle, whose imposter informed Hartle that he would use Hartle's identity until he no longer wanted to, and that there was no law enforcement agency that would prosecute him).

42. *See id.*

43. *See Identity Fraud Hearings*, *supra* note 39 (statement of David Medine of the Federal Trade Commission).  Mari Frank, a victim of identity theft paid about $10,000 and spent nearly 500 hours in order to restore her credit.  Her imposter charged $50,000 using Frank's name.  Bob Hartle's imposter charged $100,000 using Hartle's name and filed bankruptcy.  Hartle and his wife moved from Iowa to Arizona in order to get the imposter arrested.  *See* Kristof, *supra* note 37, at C3.

or abet, any unlawful activity that constitutes a violation of Federal law, or that constitutes a felony under any applicable State or local law."[44]  Whereas, prior to the Act it was only considered a crime to produce false identification,[45] transfer false or stolen identification,[46] or possess—with the intent to use—five or more illegal or false identification documents,[47] the Act makes it a crime to use the identification of another in an illegal activity.[48]

The Act attempts to offer restitution to the victims of the crime by amending the federal sentencing guidelines.  A court will be allowed to consider whether the loss suffered by the victim of the crime would be an appropriate measure of the penalty the perpetrator is required to pay.[49]  Thus, victims can be compensated for losses they incurred in restoring their credit.

The Act offers support to victims by establishing a complaint and referral service through the Federal Trade Commission ("FTC").[50]  The Act specifically directs the FTC to establish procedures to "log and acknowledge the receipt of complaints by individuals"[51] who have been the victims of identity theft. The FTC will also "refer complaints . . . to appropriate entities . . . including the [three] major national consumer reporting agencies; and . . . appropriate law enforcement agencies for potential law enforcement action."[52]  Thus, the FTC will help victims of identity fraud to restore their credit and stop the perpetrators who have assumed their identities.

Criminal bankruptcy fraud provisions have long provided for prosecution of a false statement under penalty of perjury in a bankruptcy proceeding.[53]  Numerous prosecutions have been brought under § 152 for use of a false name or social security number in a

---

44. Identity Theft and Assumption Deterrence Act of 1998, Pub. L. No. 105-318, 112 Stat. 3007 § 3(a)(4) (1998).

45. *See* 18 U.S.C. § 1028(a)(1) (1995).

46. *See id.* § 1028(a)(2).

47. *See id.* § 1028(a)(3).

48. *See* Identity Theft and Assumption Deterrence Act of 1998, § 3(a)(4).

49. *See id.* § 4(a),(b)(3).

50. *See* id. § 5(a); *Identity Fraud Hearings, supra* note 38.

51. Identity Theft and Assumption Deterrence Act of 1998, § 5(a)(1).

52. *See id.* § 5(a)(3).

53. *See* 18 U.S.C. § 152(3) (1995); United States v. Lindholm, 24 F.3d 1078, 1083-85 (9th Cir. 1994).

bankruptcy filing.[54]  Prosecutors can also charge an identity thief who knowingly, with the intent to deceive, uses a social security number that is not issued to him or her under a more specific provision governing the fraudulent use of false social security numbers.[55] The combination of existing federal law and the new identity theft provisions now provide prosecutors with the ability to charge identity thieves and catch them after the fact.  As explained below, however, they do nothing to prevent the crime from occurring in the first place.

### B.  State Law

In 1998, thirty-seven state legislatures considered identity theft legislation.[56]  However, due to privacy concerns only seven states actually enacted laws.[57]  The different states define the offense differently.  Georgia defines financial identity fraud as an unauthorized person obtaining identifying information to access financial resources of another.[58]  Kansas makes it a misdemeanor to obtain, possess, transfer or use an identification document not belonging to the user.[59]  West Virginia makes it a felony to take the name, birth date or social security number of another with the intent of fraudulently representing oneself as that person to make financial transactions.[60] Wisconsin makes it a crime to use without consent personal identifying information of another to obtain anything of value.[61]

---

54.  *See* Indictment, United States v. Jolly, No. CR 93-991 (C.D. Cal. 1993) (on file with *Loyola of Los Angeles Law Review*), Indictment, United States v. Weiss, No. SA CR 89-32 (C.D. Cal. 1989) (on file with *Loyola of Los Angeles Law Review*), Indictment, United States v. Dennis, No. CR 89-832 (C.D. Cal. 1989) (on file with *Loyola of Los Angeles Law Review*); Martin Berg, *U.S. Attorney Targets Fraud In Bankruptcy*, DAILY J., Dec. 19, 1997, at 2 (discussing prosecutions of five people charged with filing bankruptcies under false names or social security numbers).

55.  *See* 42 U.S.C. § 408(a)(7)(B) (1994) (making it a crime to knowingly use a social security number that is not issued to the user).

56.  *See Trends in Privacy Law: Identity Fraud in the 50 States*, METRO. CORP. COUNS., Aug. 1998, *available in* WESTLAW 8/98 METCC 37.

57.  *See id.*

58.  *See id.*

59.  *See id.*

60.  *See id.*

61.  *See id.*

### C. California Law

In January 1999, California passed a law making it a felony to assume someone's name, social security number or any other form of identification to obtain credit, goods, or services.[62]  Identity thieves can face up to three years in jail and fines up to $10,000.[63]  Previously, California classified the crime as a misdemeanor which was not often prosecuted by district attorneys.[64]

California did take an early role in the prevention of identity theft in 1975, when it passed the Consumer Credit Reporting Agencies Act.[65]  The Act imposed limitations as to when a person can obtain another's credit information.  Such information may be obtained only for credit transactions, court cases, insurance claims, and housing and other legitimate business needs.[66]  The Act requires the user of credit information "[to] certify the purposes for which the information is sought and [to verify] that the information will be used for no other purposes."[67]  However, these precautions were not adequate in preventing identity theft, as thieves could pose as potential landlords or employers in order to steal someone else's credit information.[68]

California has also recently enacted a law to help victims of identity theft restore their credit.  Recently enacted bills will help victims with the daunting task of erasing fraudulent charges on their credit reports which were run up by imposters. The victim of an identity theft can file a police report pursuant to section 530.5 of the California Penal Code (the unauthorized use of personal identifying information).  Then, the victim submits the police report to his or her credit reporting agency.[69]  Under California Civil Code section 1785.16(k), the credit reporting agency must "promptly and permanently block reporting any information that the consumer alleges

---

62.  *See* CAL. PENAL CODE § 530.5 (West 1999); Peter Hartlaub, *Garcetti Targets Identity Theft: New Law Sharpens Penalty for Crime*, L.A. DAILY NEWS, Dec. 31, 1998, at N3.
63.  *See* Hartlaub, *supra* note 62, at N3.
64.  *See id.*
65.  *See* Ramirez-Palafox, *supra* note 12, at 485.
66.  *See id.* at 486.
67.  CAL. CIV. CODE § 1785.14(a) (West 1998).
68.  *See* Ramirez-Palafox, *supra* note 12, at 486.
69.  *See* CAL. CIV. CODE § 1785.16(k) (West 1998).

appears on his or her credit report as a result of a violation of section 530.5 of the Penal Code so that the information cannot be reported."[70]

### D. The Shortcomings of Current Law in the Bankruptcy Context

Federal and California law now offer help to identity theft victims who seek to restore their tarnished credit records and give prosecutors a way to prosecute identity thieves when the crime can be proven. This is one area, however, where an ounce of prevention is worth a pound of cure. Regardless of how stiff the criminal sanctions are made for filing bankruptcy in someone else's name, they will not help the vast majority of bankruptcy identity theft victims.

The problem with these laws is that they do not offer much practical help in combating identity fraud in bankruptcy filings. First, because there is no way to ensure that the person filing is who they claim to be, people who file under another's name or with a false social security number leave no trace of who *actually* filed the false petition and therefore, prosecutors have little evidence on which to build a case.[71] Law enforcement agents have been successful in locating fingerprints on a number of fraudulent filings and tracing them to the identity thief,[72] but often latent prints cannot be found on the filing or they do not match up to anyone on file in law enforcement data banks. Similarly, where a crook has been living under an alias for years, all investigation leads to a dead end where no one can be found who knows the true name or location of the crook.

Second, even where there is a criminal prosecution, the victim is really never made whole. Where a car or home loan is denied due to a false bankruptcy on one's record, the delay can have serious and

---

70. Some credit reporting agencies criticize the new law as they feel it will lead to abuse. *See California Takes Aim At Identity Theft*, CREDIT CARD MGMT., June 1, 1998, at 8.

71. *See* Apodaca, *supra* note 18, at A3.

72. For example, in the George Kingstro prosecution, Kingstro's palm print was found below the signature line of the bankruptcy petition he filed in his victim's name. The prints were in local law enforcement files due to previous convictions. It turned out that the victim's wallet had been stolen a few months before the bankruptcy filing and Kingstro had rented an apartment in his name. *See* Indictment, United States v. Kingstro, No. CR 89-707 (C.D. Cal. 1989) (on file with *Loyola of Los Angeles Law Review*).

irreversible effects on an individual's life. Even where the identity thief is caught and prosecuted to the fullest extent of the law and the bankruptcy court orders the false bankruptcy filing to be expunged, the bankruptcy filing keeps appearing on the victim's credit report.

Aaron Truman,[73] an experienced fraud investigator for the California State Department of Insurance, found out about this when he decided to investigate Eugene Hawkins and Sandra Welch, the operators of "HDI Financial & Legal Services." After learning of Truman's investigation, Welch and Hawkins proceeded to call up Truman's credit report and make note of his actual social security number and credit cards. They then filed a bankruptcy in his name, with his true creditors and identifying information. Investigator Truman received his first indication of this event when he tried to use his credit card for a routine purchase and was turned down. His dismay at learning about the fraudulent bankruptcy was similar to many other identity fraud victims in the same situation. He, however, had some suspicions of who might have done it, as he had learned in his investigation that Hawkins and Welch were responsible for hundreds of fraudulent bankruptcy filings. Fortunately, he found telltale fingerprints and other evidence linking Hawkins and Welch to the fraudulent filing.

Although Hawkins and Welch were convicted and sentenced for this crime and given additional jail time for their attempts to obstruct a criminal investigation, the results of their filing plagued Truman for years. Despite the conviction, expungement order, and numerous written requests from both Truman and the United States Attorney to stop, credit reporting agencies kept re-reporting a bankruptcy filing in his name.

Third, creditors who were defrauded by the identity thief rarely obtain restitution. If an eviction was wrongfully delayed, the property owner has simply lost the rent for the time the bankruptcy delayed the eviction. If credit has been extended based on the false identifying information, the debt must be written off. A dismissal of the bankruptcy may give the creditor the legal right to chase the

---

73. *See* Indictment, United States v. Hawkins, No. CR 94-944(A) (C.D. Cal. 1995) (on file with *Loyola of Los Angeles Law Review*).

debtor, but the dismissal is to no avail where the true identity of the debtor is not known or the individual is judgment-proof.

Lastly, the official record of bankruptcy filings is corrupted regardless of subsequent events. Attempts are being made to automate access to all bankruptcy filings and allow for more accurate information gathering about bankruptcy filings, yet thousands of files in the system are simply a fiction.

Any prevention, or at least deterrence, of these false filings must occur at the point where the bankruptcy petition is filed. Occasionally, an identity thief will proceed all the way through to discharge,[74] but the vast majority of the cases are filed solely to obtain the automatic stay for as long as local court procedures allow. Because identity thieves do not want to be detected and often move on to use other names, they usually do not show up at the required meeting of creditors normally held a month or two after the case is filed.[75] The benefit of the automatic stay is already realized by the time this hearing is held, and checking identification at this point is too late to prevent the fraud.

## III. THE PROPOSED SOLUTIONS

### A.  *Debtors Must Show Photo Identification upon Filing for Bankruptcy*

One very practical deterrent to false bankruptcy filings would be to make it clear that the local clerk's office has the authority to require filers to show photo identification when they first file their petitions for bankruptcy. Although there are no provisions which currently prohibit a court from adopting such provisions, some judges have expressly questioned whether they have such authority. Currently, in order to file bankruptcy, the debtor is required to "file a list of creditors . . . a schedule of assets and liabilities, a schedule of current income and current expenditures, and a statement of the debtor's financial affairs."[76] The clerk at the bankruptcy court is required to accept the petition and cannot refuse it "solely because it is not

---

74. *See* 11 U.S.C. § 727 (1995).
75. *See id.* § 341(a).
76. *See* 11 U.S.C. § 521(1) (1988).

presented in proper form."[77]  Although there is no authority one way or the other,[78] the rules can be interpreted as requiring a clerk to accept a bankruptcy petition from anyone posing as a debtor.  For a "debtor" using another person's name or social security number, there is no reason to fear getting caught filing a false bankruptcy petition.

Because bankruptcy identity fraud appears to be a problem in only certain areas of the country, it is important to simply provide the discretion for the local court to implement an identity checking procedure and not to require the procedure in every court.  Courts with a significant level of complaints about false filings can implement identity checking procedures.[79]  Courts where this is not a problem can choose not to be burdened by the procedure.

Section 301 of Title 11, United States Code, could easily be amended to provide such discretion to the local district by reading as follows:

> (b) The court may adopt a local rule providing that the clerk refuse to accept a voluntary petition by an individual debtor or joint debtors unless the debtor:
>
> > (1) shows documents that establish his/her identity to the clerk at the time of filing the petition, or prior to filing the petition, provides such proof to a designee of the clerk; or
> >
> > (2) files a declaration under penalty of perjury by the debtor's attorney that the attorney has reviewed documents sufficient to reasonably establish the identity of the debtor.

---

77. *See* Bankr. R. 5005 (a)(1) (1995).

78. Because there is no clear authority prohibiting the implementation of identification procedures, courts facing this problem should institute such rules at this time.  Congress should make the law clear that such an exercise of the local court's authority is allowed in order to provide assurance to those who need it.

79. The document used for purposes of identification should be documented by the clerk, preferably by obtaining a photocopy of the document (for example, a driver's license or state identification card).  The clerk could also note information about the identification, such as the license number, issuing state, and expiration date.

The procedure should be made the least burdensome as possible on legitimate filers. Where the debtor has an attorney, the attorney can look at the appropriate identification and certify such review as part of the filing. Where pro se debtors live a significant distance from the courthouse, provisions can be made for them to have their identity checked by a trustee located nearby. As almost every bankruptcy identity theft ever reported has been a bankruptcy filed without the assistance of an attorney, the incidence of attorneys assisting an identity theft is likely to be extremely low. Furthermore, any fraudulent activity by an attorney can be redressed through the state bar disciplinary process.

Certainly, this procedure will not stop all identity theft in bankruptcy court. The more clever thieves will obtain false identification. If false identification is provided, however, it should at least provide a true photograph and possibly other clues to provide some chance of catching the identity thief. Showing identification will deter many of these people and make it more difficult to file a false bankruptcy.

It is shocking to identity theft victims that a filing in their name is even possible without them knowing about it and that the federal court system does nothing to prevent such victimization through bankruptcy. This minimal identification procedure sends victims the message that the court does care and is taking some steps to prevent this crime.

## B. *Expungement of False Bankruptcy Filing from Victim's Record*

A second problem not adequately addressed under the current Bankruptcy Code is that there is no clear provision allowing for expungement of a fraudulently filed bankruptcy. This leaves bankruptcy judges unsure of how they can or should handle these victims even where a victim has spent the time and expense to prove he or she was not the one who filed the bankruptcy.

An amendment to 11 U.S.C. § 107(b) to allow for easier expungement of the bankruptcy record of a victim would help address this problem. Section 107(b) currently allows the court, on a party's motion or its own motion, to protect trade secrets or seal scandalous

or defamatory information.[80]   A third provision should be added as follows to allow the court:

> (3) to protect a person whose name, social security number, address, or other identifying information is recorded as that of the debtor on a voluntary petition but who has proved that such filing was due to forgery or fraud of another without the authority of the person.

Ideally, courts would have forms and procedures that in pro per individuals could obtain to pursue such a motion without the expense of an attorney.   A credit reporting agency that continues to report a fraudulent bankruptcy in the victim's name after such an expungement order would be liable under existing laws,[81] but perhaps courts should then consider use of their contempt powers if the expungement order is not followed.

## C. Social Security Numbers Verification with Debtor's Information

Lastly, there should be some amendment to the laws governing access to social security numbers to allow court clerks to do routine checks of the social security number listed on a petition to be sure it matches the name used.   This could be done electronically and automatically with the appropriate technology in place.   Because access to social security numbers raises many concerns about privacy[82] and access to social security numbers should be severely limited, a system must be developed where no one can access the system to search for an individual's social security number.   Admittedly, this proposal requires both legislative change as well as programming and automation changes at the clerk's office.   However, the linking of the social security database and the social security numbers listed on the petitions being filed would provide a significant deterrent to fraud and assist the court in maintaining an accurate case data bank.

The automatic checking procedure should simply spit out a report stating that the number on the petition does not match the name provided on the petition.   The system could be designed so that no

---

80. *See* 11 U.S.C. § 107(b) (1995).
81. *See* 15 U.S.C. § 1681n (1988).
82. *See* Flavio L. Komuves, *We've Got Your Number: An Overview of Legislation and Decisions To Control the Use of Social Security Numbers as Personal Identifiers*, 16 J. MARSHALL J. COMPUTER & INFO. L. 529 (1998).

one can put in a number or a name without tying it to a bankruptcy case number. An automatic order to show cause could be issued ordering the debtor to appear and explain the discrepancy between the name and social security number on the petition. In this way, debtors who have made a legitimate mistake in putting their social security number down would have an opportunity to explain and correct the problem. Those who are attempting to defraud will have their petitions dismissed quickly, at least reducing the harm done by the fraudulent filing.

Such a cross-check system would give bankruptcy courts the basic tool to try to prevent the obtaining of an automatic stay or even a discharge using a false social security number—something private companies have now, but which is unavailable to the bankruptcy court. Private companies and resourceful crooks have access to the social security number of anyone who has a credit record maintained by any of the commercial credit reporting agencies. Thus, an individual's name, social security number, and credit information can easily be obtained for commercial and nefarious purposes, but cannot be accessed to prevent the victimization of those same people. In order to fight government intrusion into our personal lives, we have prevented government systems from providing basic deterrent measures for fraud, yet we allow anyone with access to commercial credit reporting services to utilize our personal identifying information in all sorts of ways.

This result does not make much sense to victims of identity fraud who feel the results of that fraud in their lives for many years. This is especially shocking given that the bankruptcy identity fraud victim would not have been victimized in that manner were it not for the nature of a federal court system and laws that provide for an automatic stay with no questions asked and no court review until after the crime is complete.

## IV. CONCLUSION

In the new information age, we all need to realize that more intangible crimes such as a false bankruptcy filing in someone's name can have just as serious an effect on the victim's life as the theft of funds from a wallet or bank account. Where a federal court is utilized by the thief in perpetrating this crime, the least we can do is

design rules to try and prevent the crime. It is time for some much needed attention to this aspect of identity fraud. Legislation designed to deter this crime might not help the current victims in getting their lives back on the right path, but it will prevent many future identity frauds.